2021 IL App (3d) 190445

Opinion filed December 14, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
|---|---|---|
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-19-0445 |
| v. | ) | Circuit No. 18-CF-212 |
| | ) | |
| ASHANTI D. ROBERTS, | ) | Honorable |
| | ) | H. Chris Ryan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Lytton and Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Ashanti D. Roberts, appeals following her conviction for felony murder. She

contends that the trial court deprived her of her constitutional right to counsel of choice by

failing to adequately inquire into her request for substitute counsel. She also argues that defense

counsel was ineffective for failing to move to suppress statements made to the police. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The State charged defendant, along with Tamil Adams and Hashim Waite, with felony

murder predicated on robbery. 720 ILCS 5/9-1(a)(3) (West 2018) (felony murder); *id.* § 18-1

(robbery). The indictment alleged that defendant, Adams, and Waite shot Maria DeLaTorre in the chest, thereby causing her death, in the course of committing a robbery.

¶ 4                                                 A. Pretrial Proceedings

¶ 5        On May 24, 2018, the day after defendant's arrest, the trial court appointed the public defender's office to represent defendant. Assistant public defender Douglas Kramarsic was assigned to the case and appeared for the first time at defendant's arraignment on June 8, 2018.

¶ 6        Defendant sent a handwritten letter to the trial court 17 days later. In the letter, defendant alleged that counsel had "no information," was not on her side, and was not "fighting" to the best of his ability. Defendant also alleged that counsel had not been communicative with her family members.

¶ 7        In a letter sent to the court in August, defendant again alleged that counsel was not performing to the best of his abilities. Defendant further asserted: "I'm basically fighting for my life [b]ut he doesn't see that and we don't get along. I feel someone else should be given my case." Defendant also cited counsel's recommendation that she accept the State's plea offer as evidence that counsel was "biased" and "not on [her] side." According to defendant, counsel urged that "if [she] didn't take the offer[,] the other defendant will." Defendant also noted that counsel's tone "was not nice at all" and that counsel "judge[d]" her, despite not even knowing her. Defendant also requested an "extension" so that her family could hire private counsel.

¶ 8        At the next court date, August 16, 2018, the trial court asked counsel to address the allegations contained in the letters. Counsel indicated that he believed the issues had been resolved and that defendant wished to withdraw the complaints. Defendant agreed that she was withdrawing the complaints and stated that she was happy with counsel's performance. The court

2

urged defendant to speak with counsel rather than initiate *ex parte* communications with the court.

¶ 9     Two weeks later, defendant sent a letter to the court, expressing regret over having withdrawn her previous complaints. She explained that she did so only out of hope that "things between us would change." Defendant accused counsel of providing "inconsistent counseling." She asserted that counsel was under a conflict of interest because he would "get paid" whether or not defendant prevailed at trial. Defendant requested that a new assistant public defender be appointed. On September 28, 2018, the court admonished defendant that she was not to send letters to the court. It did not address the substance of her latest letter.

¶ 10     On October 17, 2018, counsel informed the court that defendant's family had been in contact with a private counsel, with the intent that private counsel would take over the case. Counsel asked for a continuance so that defendant might finalize that arrangement. The court set the matter for a bench trial on December 13, 2018. Private counsel subsequently appeared in court and entered his appearance on December 11, 2018. The court granted Kramarsic leave to withdraw. The December 13 trial date was stricken.

¶ 11     On February 6, 2019, private counsel filed a motion to withdraw. Private counsel acknowledged that financial concerns were a primary reason, though not the sole reason, for his desire to withdraw. The State expressed concerns about delay, asserting: "[T]his will substantially delay the case I believe, and it's already been substantially delayed." Defendant indicated that she would like more time to attempt to pay private counsel. The court told defendant that its patience was "just about shot." It granted an eight-day continuance to allow respondent the opportunity to resolve matters with private counsel. The court urged defendant that the case had to move forward.

3

¶ 12    At her next court appearance, on February 14, 2019, defendant informed the court: "We tried to pay the lawyer more money but that didn't work." The court allowed private counsel to withdraw and reappointed the public defender's office. Kramarsic was ultimately reassigned to the case. He requested a continuance on March 1, 2019; on March 14, a bench trial was scheduled for May 9.

¶ 13    The parties appeared for a final pretrial hearing on May 8, 2019. The parties agreed that defendant faced a sentence of 20 to 60 years' imprisonment for murder, plus a mandatory 15-year firearm enhancement, such that her minimum sentence was 35 years' imprisonment. Defendant would be obligated to serve 100% of any sentence imposed. The State informed the court that it had made defendant a plea offer under which she would be charged with a Class X felony, entailing a sentencing range between 6 and 30 years' imprisonment and a requirement that defendant serve only 50% of her sentence. Additionally, the charging instrument would be amended to remove any reference to a firearm, thus dispensing with the firearm enhancement. The State noted that its offer contemplated a specific term of years with the Class X range but declined to disclose that information to the court. Counsel commented that the offer had been relayed to defendant, but that she had thus far declined all offers.

¶ 14    After defendant apparently drew the attention of the court, the following colloquy ensued:

THE COURT: "Yeah, [defendant], go ahead. Do you have a question?

THE DEFENDANT: No. I have a complaint.

THE COURT: Okay. What's your complaint?

THE DEFENDANT: I have some valid things on Mr. Kramarsic and [La Salle County Public Defender Timothy] Cappellini. I believe I was unfairly— I was really feeling attacked, honestly.

THE COURT: Okay.

THE DEFENDANT: They have not—

THE COURT: How do you feel attacked, ma'am?

THE DEFENDANT: They have not—they have not prepped me for trial. Mr. Cappellini came in and tells me I was guilty and that you're automatically going to do the 35 years. I don't feel like they're on my side and, by the constitutional law, I feel like I'm getting insufficient counsel.

I also have somebody from the NAACP who is willing to look into my case at this moment that we have already spoken to. I really don't feel like I'm going to be prepped for trial, and I feel that they are against me, and that they are not willing to defend me due by the constitutional law because I'm financially unable to understand it. By law, they are supposed to represent me with every effort which they are not.

THE COURT: Mr. Cappellini, respond please.

MR. CAPPELLINI: Mr. Kramarsic is going to try the case. He just asked me to review it with him which I did. I went down and explained to her what I believe the State can prove beyond a reasonable doubt and what my position on that was and that she should look at her options. That's all.

THE COURT: Mr. Kramarsic, any response to what was said her by the defendant?

MR. KRAMARSIC: Yes, your Honor, those conversations did take place. I spoke with her regarding the same matters. I've spoken with her numerous times regarding her defense to this matter. I've had multiple conversations with her regarding what I felt about that so the fact that she doesn't feel ready, Judge, I'm ready.

THE COURT: Okay. All right. [Defendant], anything else, ma'am?

THE DEFENDANT: I don't feel like they are on my side. Like I said, I feel like they are against me the way that they talk to me.

THE COURT: You felt like what, ma'am? I'm sorry.

THE DEFENDANT: I don't feel like they are with me.

THE COURT: Okay.

THE DEFENDANT: Your honor, I don't.

THE COURT: Okay.

THE DEFENDANT: And by constitutional law, I know they are supposed to represent me cause I'm financially unstable and, like I said, he's given me inconsistent counsel and I have not been prepped for trial And for Mr. Cappellini and Mr. Kramarsic to sit there and just accuse me of being guilty and that I'm going to automatically get 35 years, I feel like that was inappropriate. That was very unprofessional because, by law, I'm innocent until proven guilty in court, sir.

THE COURT: Mr. Cappellini, about the accusations made by her?

MR. CAPPELLINI: We've explained to her based on the evidence what our advice would be. We've told her that we would do the best we possibly can in defending her.

MR. KRAMARSIC: That is correct, your Honor.

THE COURT: Mr. Kramarsic, any response? I'm sorry.

MR. KRAMARSIC: I told her the same exact thing, your Honor.

THE COURT: All right.

Mr. Kramarsic, with regard to such facts then, it's been represented to me you're trying the case. How prepped do you—you'll do the best you can with this?

MR. KRAMARSIC: Correct, Judge.

THE COURT: With everything you've got?

MR. KRAMARSIC: Absolutely.

THE COURT: All right. You talked to your client about your pros and cons?

MR. KRAMARSIC: Yes, your Honor.

THE COURT: You've got any witnesses lined up that she has asked you to do or—

MR KRAMARSIC: No, your honor.

THE COURT: In your choice? I mean, you're the trial counsel. You're going to call or not call, not her.

MR. KRAMARSIC: Correct.

THE COURT: Okay. But you feel you're ready on that?

MR. KRAMARSIC: Correct, Judge, yes.

THE COURT: Based upon what I've heard so far, I don't see any reason why we should continue this.

All right, [defendant], thank you very much. I appreciate it. See you tomorrow afternoon.

THE DEFENDANT: Your Honor, can I say one more thing?

THE COURT: Sure, go ahead.

THE DEFENDANT: He has not prepped me. He has not asked me questions. He has not asked me for witnesses. He has not told me what our defense was. He has not done any of those, which is why I have the NAACP with a lawyer who is willing to step in, but he said the only thing he can do is try to come up here and get a continuance, if he can, but he won't be available tomorrow for the 9th, but he said he's willing to get in the case at this time.

THE COURT: Okay. Mr. Kramarsic.

MR. KRAMARSIC: Judge, the defense that we have discussed is not necessarily a defense that would require multiple witnesses without getting too far into it, your Honor.

THE COURT: Right, I don't want to know.

MR. KRAMARSIC: But we've discussed this before, Judge.

THE COURT: All right. In light of the fact of that representation then, we're just going to go ahead and go forward."

¶ 15                                  B. Trial

¶ 16        The evidence at defendant's bench trial established that at approximately 8:30 p.m. on May 22, 2018, defendant, Adams, and Waite arrived the Streator home of DeLaTorre. After a

8

failed attempt by Adams to enter the house, gunshots were fired, resulting in the death of DeLaTorre. After receiving a call describing a black car leaving the scene of the shooting, police located that vehicle speeding on the interstate. The car, later found to be registered to defendant, crashed into a ditch, at which point defendant, Adams, and Waite exited the vehicle and fled. Defendant was apprehended on foot with Adams sometime between 4:00 a.m. and 4:30 a.m. Waite was apprehended as well.

¶ 17　　　　Waite testified that he had known defendant since the beginning of 2018. He had known Adams for two years. In the week prior to the incident, Adams had been "talking about going and hitting this lick." Waite explained that a "lick" was a robbery. Two days before the incident, Waite encountered defendant "on the block." Waite asked defendant if Adams had told her about the lick. When defendant indicated that he had not, Waite described the lick to her. Waite testified: "I was trying to see if she was going to take us." He added: "I told her that we needed to go to Kankakee. It was an hour and a half away. We was gonna get some weed and some money, and we was gonna be back the same day, and I told her we was going to cut her in."

¶ 18　　　　Waite testified that defendant "didn't really say nothing" in response to his description of the lick. The next day, Waite contacted defendant via Facebook to ask whether she would participate in the lick. That message exchange, which was admitted into evidence after being recovered from defendant's phone, indicated that Waite said to defendant: "Man, we need to hit that lil lick [Adams] got." One minute later, defendant responded: "Let me Get the kids n LIL did to og house n yes that's."

¶ 19　　　　On May 22, 2018, Waite and Adams called defendant. Defendant picked the two men up, and they began driving. Waite believed they were "on [their] way to go hit the lick" at that point but defendant first had to pick up and drop off her children and sister. Waite was carrying a gun

9

when defendant picked him and Adams up. Waite sat in the front passenger seat and loaded the gun. He could not say if defendant saw the gun. After dropping off defendant's family members, Waite switched places with defendant and drove to Streator.

¶ 20    After arriving at DeLaTorre's house, Adams and Waite got out of the car. Defendant moved into the driver's seat, without having been asked. Waite gave the gun to Adams. Waite and Adams approached the house and spoke to DeLaTorre's 15-year-old son, Anthony Cantu, through a window. Adams raised the gun and told Cantu to "give me that shit." A yellow truck in which DeLaTorre was a passenger arrived while Adams and Waite were attempting to get into the house. Adams fired a shot through the window through which he had been addressing Cantu, then fired three more shots. Adams and Waite ran back to the car. Waite testified that Adams fired three additional shots after reaching the front yard. They entered the car and defendant drove away, again, without needing to be prompted to do so.

¶ 21    Waite testified that he had two prior felony convictions for firearms offenses. He had been charged with first degree murder in the present case, a charge for which he faced a sentencing range between 35 years and life imprisonment. He would be obligated to serve 100% of any sentence stemming from that charge. In exchange for his testimony against defendant, the State had agreed to dismiss the murder charge. Waite would instead plead guilty to home invasion with a recommended sentence of 30 years' imprisonment. He would be eligible for day-for-a-day good conduct credit, such that he might only serve 50% of any term of years imposed. Also as part of the agreement, the State had dismissed an aggravated battery charge stemming from an altercation in the jail while Waite was awaiting resolution of the present case.

¶ 22    Detective Jason Moore of the Streator Police Department testified that he was investigating the shooting when he learned that defendant and Adams had been taken into

10

custody in the early morning hours of May 23, 2018. Moore described defendant as wet and dirty when he first encountered her. He noticed that defendant had grass in her hair and recalled that she was cold and tired. Moore and Detective Troy Dodge interviewed defendant in two separate sessions that morning.

¶ 23    The State moved to introduce video recordings of the interviews into evidence and play them in court. Defense counsel responded: "Your Honor, we have Investigator Moore here to testify. I don't see any reason we need to play the videos." After inquiring into the exhibit number, the court stated: "Go ahead and play it."

¶ 24    The video recording shows defendant entering a room with Moore and Dodge at 5:42 a.m. Dodge reads defendant her *Miranda* rights, and defendant indicates that she understands. After Dodge acknowledges that defendant had had "a long night," defendant tells the investigators that her body was "soaking wet."

¶ 25    Defendant initially explains that she wanted to slow down when police approached her car on the interstate, but the man she was with would not let her. Defendant states that she was kidnapped at gunpoint in Chicago and forced to drive her car by two men, one tall and one short. She did not know either man's name. She did not know to where the men were forcing her to drive. The men forced her to take a pill that made her tired.

¶ 26    Defendant confirms that she had her phone with her during the previous day. At 5:54, Dodge asks if she would allow the investigators to search through her phone to verify elements of her account. Defendant agrees, then tells Dodge the passcode to her phone. Over the next 43 minutes, defendant reiterates that she did not know the men she was with. She believed the men were discussing a robbery in coded language throughout the drive to Streator. Defendant tells the investigators that her fear prevented her from fleeing when the men exited the vehicle.

11

¶ 27 After a 55-minute break in the interview, Moore and Dodge return to the room. The investigators implore defendant to tell the truth, implying that doing so is the only way she will be able to see her children again. Defendant then delivers a new explanation of the events. She admits to knowing Waite and Adams. Defendant explains that Adams had asked her for a ride to Streator, but she did not know why they were going there. She also explains that her previous comment that Waite and Adams were making coded references to a robbery during the drive was something she had made up as a part of her false kidnapping story. After defendant, Adams, and Waite fled the scene, Adams admitted to defendant that they had come to Streator to "hit a lick." Defendant drove the car fast after the robbery at the encouragement of Adams and Waite. She was concerned that Waite would hurt her if she slowed down.

¶ 28 Brian LaBeau, an investigator with the La Salle County State's Attorney's Office, testified that he extracted Facebook messages from defendant's phone. He estimated that he conducted such extractions between 50 and 75 times per year. LaBeau was in an adjacent room during defendant's interview and entered the passcode into her phone soon after she provided it to Moore and Dodge. LaBeau testified that in the course of his work he had become familiar with the term "lick," and knew it to mean a robbery.

¶ 29 The court found defendant guilty and sentenced her to 35 years' imprisonment.

¶ 30                                II. ANALYSIS

¶ 31 Defendant raises two arguments on appeal. First, she contends that the trial court failed to adequately inquire into her request for new counsel, thus depriving her of her constitutional right to counsel of choice. Second, she argues that counsel was ineffective for failing to move to suppress her statements to the police. We affirm.

12

¶ 32                                    A. Counsel of Choice

¶ 33        The sixth amendment of the United States Constitution guarantees a criminal defendant

the right to the assistance of the counsel of her choice. *People v. Ortega*, 209 Ill. 2d 354, 358

(2004). That right, however, is "circumscribed in several important respects." *Wheat v. United

States*, 486 U.S. 153, 159 (1988). For instance, a defendant may not select as her advocate a

person who is not a member of the bar or whose services she cannot afford. *Id.* Additionally, "a

trial court is granted 'wide latitude in balancing the right to counsel of choice against the needs

of fairness [citation] and against the demands of its calendar.' " *People v. Baez*, 241 Ill. 2d 44,

106 (2011) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006)). "Violations of

the right to counsel of choice are structural errors not subject to harmless-error review, and they

therefore do not depend on a demonstration of prejudice by defendant." *Id.* at 105.

¶ 34        The right to counsel of choice "may not be employed as a weapon to indefinitely thwart

the administration of justice or to otherwise embarrass the effective prosecution of crime."

*People v. Friedman*, 79 Ill. 2d 341, 349 (1980). Where a defendant requests a continuance in

order to procure or accommodate her counsel of choice, the denial of that request will not be

reversed absent an abuse of discretion. *Id.* at 348. The factors to be considered when analyzing

the trial court's exercise of its discretion include the diligence of the movant and the interests of

justice. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000). Other relevant factors may include

            "whether defendant articulates an acceptable reason for desiring new counsel;

            whether the defendant has continuously been in custody; whether he has informed

            the trial court of his efforts to obtain counsel; whether he has cooperated with

            current counsel; and the length of time defendant has been represented by current

            counsel." *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008).

¶ 35　　　　It is well settled that where a defendant requests a continuance for this purpose, the trial court may not summarily deny the request, but must inquire into its basis. *People v. Jenkins*, 2020 IL App (1st) 172422, ¶ 13; see *People v. Green*, 42 Ill. 2d 555, 556-57 (1969). "In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic." *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992). The failure to make a proper inquiry into the request is grounds for reversal. See *Tucker*, 382 Ill. App. 3d at 921-23 (collecting cases).

¶ 36　　　　Defendant's repeated assertions that the trial court here made "no inquiry regarding [defendant's] constitutional right to choose her counsel" are affirmatively rebutted by the record. The trial court provided defendant with multiple open-ended opportunities to express the reasons for her dissatisfaction. *Supra* ¶ 14. Each time, the court turned to counsel—and his boss—to respond to defendant's complaints. The court also asked counsel certain questions about his preparation for trial, in response to defendant's assertion that counsel had not prepared her for trial. A defendant's reasons for desiring new counsel and her cooperation with existing counsel are relevant factors for the trial court to consider where a defendant requests a continuance to obtain new counsel. *Tucker*, 382 Ill. App. 3d at 920. These were the factors into which the court inquired directly. While the court proceeded largely by way of allowing all parties involved to speak narratively, rather than by asking pointed questions, the process was no less an inquiry.

¶ 37　　　　Defendant also argues, more specifically, that the trial court did not ask defendant any questions about the proposed new counsel with whom she had been in contact. This argument fails to recognize that defendant *did* convey to the court much relevant information about proposed new counsel. Primarily, the fact that the new attorney was merely "willing to look into"

14

the case was telling. That phrase clearly indicated that new counsel's involvement in the case was at such an early stage that the resulting delay was likely to be significant. Also, that new counsel was associated with the NAACP at least suggested a *pro bono* or reduced fee arrangement, such that the same issues encountered by previous private counsel were less likely to arise. Again, the trial court cannot be faulted for the fact that defendant offered this information when given the opportunity to speak freely, rather than waiting to respond to questions from the court.

¶ 38　　　Finally, the trial court had, at the time of defendant's request, existing knowledge of other relevant circumstances. For example, without asking any further questions, the court would have known that the request was being made the day before trial and that defendant had not previously informed the court—or, presumably, defense counsel—of her attempts to procure new counsel. These facts were indicative of defendant's diligence. The court would also have been well aware that defendant had previously procured private counsel two days before a scheduled trial, resulting in a nearly three-month delay in the case. The adequacy of a trial court's inquiry in this context must be measured with the court's existing knowledge in mind. The alternative is to require the court to ask questions to which it already knows the answers, a sure elevation of form over substance.

¶ 39　　　The trial court's inquiry here, in conjunction with the court's existing knowledge of defendant's case, provided it with information sufficient for it to properly exercise its discretion with respect to defendant's request for a continuance. Accordingly, reversal on the grounds of an inadequate inquiry is not warranted. As defendant raises no alternative argument that the court's actual denial of her request amounted to an abuse of discretion, we do not address that question.

15

¶ 40                           B. Ineffective Assistance of Counsel

¶ 41          Defendant next argues that counsel was ineffective for failing to file a motion to suppress

the statements defendant made to police. She contends that such a motion would have been

granted if filed because those statements were involuntary and coerced by a combination of

threats regarding her children, false promises of leniency, physical discomfort, and sleep

deprivation.

¶ 42          In order to establish that trial counsel was ineffective, a defendant must satisfy the

standard set forth in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984), and adopted by our

supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under that standard, a defendant

must show that counsel performed deficiently and that a reasonable probability exists that, but

for that deficient performance, the result of the appeal would have been different. *Strickland*, 466

U.S. at 694. A strong presumption exists that counsel's decision to not file a motion to suppress

is a sound trial strategy, such that that decision cannot be deemed deficient performance. *People

v. Gayden*, 2020 IL 123505, ¶ 28. Further,

> "where an ineffectiveness claim is based on counsel's failure to file a suppression
>
> motion, in order to establish prejudice under *Strickland*, the defendant must
>
> demonstrate that the unargued suppression motion is meritorious, and that a
>
> reasonable probability exists that the trial outcome would have been different had
>
> the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 43          Defendant's argument that counsel was ineffective suffers from a fundamental flaw: the

statements she urges should have been suppressed were not particularly incriminating. While

defendant eventually admitted that she knew Adams and Waite—and that they did not abduct her

at gunpoint—she always maintained that she did not know that Adams and Waite intended to

16

commit a robbery and that she did not know they had a gun. Proof that defendant intended to promote or facilitate the commission of robbery was necessary in order for the State to prove that defendant was accountable in the robbery, and thus criminally culpable in the resulting death of DeLaTorre. See 720 ILCS 5/5-2(c) (West 2018) (defining criminal accountability). Thus, defendant's knowledge of Adams's and Waite's plan was the primary issue in her trial. Nothing to which defendant admitted while speaking with Moore and Dodge tended to prove that she had that knowledge. Defendant's assertion on appeal that her statements were "crucial to the State's case" is inaccurate.

¶ 44        Defendant also refers to the Facebook messages between her and Waite—which corroborated Waite's trial testimony—as "fruit of the interrogation," arguing that without defendant's statements and those messages, the State's evidence of her accountability was uncompelling. However, defendant provided her passcode to the investigators just 12 minutes into the interrogation. There is no colorable argument to be made that defendant's consent to the search of her phone was not voluntary. In fact, defendant makes no actual argument in support of her fruit-of-the-poisonous-tree claim. Furthermore, those messages were exchanged with Waite, who testified for the State pursuant to his plea agreement. The messages were thus almost certainly an inevitable discovery, such that any coercion in garnering defendant's consent would still not result in suppression of the messages. See *People v. Sutherland*, 223 Ill. 2d 87, 228 (2006).

¶ 45        Given that defendant's statements were not of an incriminatory nature, there would be a clear trial strategy in *not* seeking their suppression. Admission of those statements gave defendant a valuable opportunity to present her innocent explanation of events without being

17

subjected to cross-examination. We need not merely speculate that counsel might have employed this trial strategy, as he actually pursued it in closing when he argued:

> "I also want to point out something in those interviews that did remain. She stayed consistent the entire time. She told them that she had nothing to do with the robbery. She was consistent. She never had any plans to split proceeds, split drugs, to split anything. There has been zero evidence presented."

¶ 46 Despite this closing argument, defendant contends that declining to move to suppress her statements to the police was not a strategic choice by counsel. She asserts that "[c]ounsel did not want the video played at trial and objected to its admission—on the (overruled) objection that it was cumulative of the officer's description of it." That argument relies on a mischaracterization of the record. Counsel had no objection to defendant's statements coming into evidence. He only questioned—without formally objecting—whether it was necessary to play the video recording, as opposed to Moore testifying to what defendant said in the interview. Counsel's suggestion seems to have been based on the time involved with each method, rather than an objection to the admission of evidence.

¶ 47 To be sure, the interview with Moore and Dodge might portray defendant in a negative light as someone who, at least originally, lied to the police. However, counsel could have reasonably decided that such a negative inference was less likely to be drawn by the trial court sitting as factfinder, and that, in any event, any risk of such an inference was outweighed by the benefit of presenting defendant's innocent explanation of events. Accordingly, defendant has failed to overcome the presumption of sound trial strategy.

¶ 48 We note that the same flaw in defendant's argument also defeats any showing of prejudice flowing from counsel's purported error. That is, defendant is unable to show that a

18

reasonable probability exists that she would have been acquitted if her statements had been suppressed.

¶ 49　　　　Waite testified that defendant played a knowing role in transporting him and Adams to, and from, the robbery, with knowledge of exactly what they intended to do. While Waite presented obvious credibility concerns, his account was corroborated by the Facebook messages. Moreover, defendant's conduct, both in not leaving the scene once gunshots were fired and in fleeing from police, allowed a further inference of guilt. In short, the State's actual evidence of defendant's knowledge would have been the same, regardless of whether her statements to Moore and Dodge were suppressed.

¶ 50　　　　Defendant has thus failed both to rebut the presumption of sound trial strategy and to demonstrate that counsel's purported error was prejudicial. Accordingly, we must reject her claim that counsel was constitutionally ineffective.

¶ 51　　　　　　　　　　　　　　　III. CONCLUSION

¶ 52　　　　The judgment of the circuit court of La Salle County is affirmed.

¶ 53　　　　Affirmed.

**No. 3-19-0445**

| | |
|---|---|
| **Cite as:** | *People v. Roberts*, 2021 IL App (3d) 190445 |
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 18-CF-212; the Hon. H. Chris Ryan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and David Holland, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Todd Martin, State's Attorney, of Ottawa (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |