**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 200031-U

Order filed May 29, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0031 Circuit No. 13-CF-272 |
| | ) | |
| KAMRON T. TAYLOR, | ) ) | Honorable Kathy Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE PETERSON[1] delivered the judgment of the court.
Justice Holdridge specially concurred.
Presiding Justice McDade dissented.

**ORDER**

¶ 1     *Held*:    The circuit court did not err in summarily dismissing defendant's postconviction petition at the first stage.

---

[1]This case was administratively reassigned to Justice Peterson for authorship on August 8, 2022. Justice Peterson has read the briefs and listened to the recording of the oral argument for this matter.

¶ 2    Defendant, Kamron T. Taylor, appeals from the first-stage dismissal of his postconviction petition. Defendant argues he presented the gist of a claim of ineffective assistance of both trial and appellate counsel. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4    On July 12, 2013, defendant was charged by indictment with first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)), attempted armed robbery (*id.* § 8-4(a)), residential burglary (*id.* § 19-3(a)), escape (*id.* § 31-6(c)), aggravated unlawful use of a weapon by a felon (*id.* § 24-1.6(a)(2)(3)(A)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged that on June 24, 2013, the defendant shot and killed Nelson Williams, after which he entered a house and attempted to rob Williams's fiancé, Rebecca Hoover. After his arrest, the defendant escaped from the Kankakee Police Department. Defendant pled guilty to aggravated unlawful use of a weapon by a felon and unlawful possession of a weapon by a felon. Following a February 2015 trial, the jury found defendant guilty of all remaining charges, and that he discharged the firearm that proximately caused Williams's death. The trial court sentenced defendant to over 100 years in prison. Defendant timely appealed.

¶ 5    On direct appeal, defendant raised one issue, arguing he was deprived of the right to a fair trial before an impartial jury due to the trial court's failure to remove juror PA for cause. Defendant argued juror PA's ability to remain fair and impartial had been compromised, where she claimed that during a lunch break her car had been followed by an African American person wearing a hoodie. Defendant argued the trial court erred in accepting juror PA's claim that she could remain impartial. *People v. Taylor*, 2019 IL App (3d) 150345-U, ¶ 13. We recognized there was support for defendant's contention that juror PA may have subconsciously linked the incident to defendant, as the person allegedly following her matched the physical description the eyewitnesses had

attributed to defendant. But we concluded the trial court applied an appropriate level of scrutiny to juror PA's assertions, and the court did not abuse its discretion when deciding not to dismiss her from the jury. *Id.* ¶¶ 18-19.

¶ 6        On November 15, 2019, defendant filed a *pro se* postconviction petition alleging ineffective assistance of trial counsel (counsel). Defendant raised multiple claims regarding this allegation: (1) counsel did not investigate certain evidence that could have proven defendant's innocence; (2) counsel failed to subpoena witnesses who would have shown why defendant had been in the area of the crime; (3) counsel failed to file a motion to suppress the identification of defendant by four eyewitnesses via suggestive show-up procedures; (4) counsel was ineffective for not offering in its entirety Illinois Pattern Jury Instruction No. 3.11 (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved October 17, 2014)) (hereinafter IPI Criminal No. 3.11); and (5) counsel was ineffective for failing to raise a challenge to juror Fraser, who had attended the same church as the prosecutor. The petition raised two claims of ineffective assistance of appellate counsel: (1) appellate counsel did not raise on direct appeal a meritorious claim of ineffective assistance of counsel; and (2) appellate counsel failed to argue defendant had not been proven guilty beyond a reasonable doubt. Defendant also claimed the trial court should have removed juror PA for alleged bias—the same claim we specifically rejected on direct appeal.

¶ 7        On January 9, 2020, the trial court issued its memorandum of decision. The court found defendant's claims of ineffective assistance of counsel could have been brought on direct appeal and were waived. It also found defendant's claim regarding juror PA was *res judicata*. The court noted it had questioned juror Fraser and determined Fraser would not feel the need to explain a not-guilty verdict because she and the prosecutor no longer attended the same church. The court quoted case law stating that appellate counsel is not required to raise every conceivable issue or to

- 3 -

raise issues on appeal that appellate counsel determines are without merit. The trial court dismissed defendant's petition as being frivolous and patently without merit.

¶ 8     Defendant timely appealed the summary dismissal of his postconviction petition.

¶ 9                                    II. ANALYSIS

¶ 10     Defendant first argues his postconviction petition sufficiently alleged the gist of a constitutional claim that trial counsel provided ineffective assistance by not moving to suppress the eyewitnesses' identifications of defendant via a show-up procedure, appellate counsel was ineffective for failing to make this argument on direct appeal, and the trial court erred in summarily dismissing his petition. The State argues the trial court correctly determined defendant's allegations of ineffective assistance of both trial and appellate counsel were frivolous and patently without merit. We affirm the first-stage dismissal of defendant's petition.

¶ 11     The Post-Conviction Hearing Act (Act) establishes a three-stage procedure whereby an incarcerated defendant may collaterally attack his or her conviction or sentence based on a substantial violation of the defendant's constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2018). In the first stage, the trial court has 90 days to independently review the petition and determine whether it is frivolous or patently without merit. *Id.* § 122-2.1(a)(2). "A petition may be dismissed as frivolous or patently without merit only 'if the petition has no arguable basis either in law or in fact'—relying on 'an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Allen*, 2015 IL 113135, ¶ 25 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)). "Meritless legal theories include ones completely contradicted by the record, while fanciful factual allegations may be 'fantastic or delusional.' " *Id.* (quoting *Hodges*, 234 Ill. 2d. at 17).

¶ 12 "At the first stage, the court must accept as true and liberally construe all of the allegations in the petition unless contradicted by the record." *People v. Walker*, 2019 IL App (3d) 170374, ¶ 13 (citing *People v. Edwards*, 197 Ill. 2d 239, 244 (2001)). "To survive dismissal at this stage, a petition need only present the gist of a constitutional claim." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996) (citing *People v. Porter*, 122 Ill. 2d 64, 74 (1988)). This is a low threshold, requiring the defendant to present only a limited amount of detail in the petition. *Id.* The defendant is not required to make legal arguments or to cite to legal authority. *Id.* "We review *de novo* the trial court's first-stage summary dismissal of a postconviction petition." *People v. Costic*, 2021 IL App (3d) 180618, ¶ 18 (citing *People v. Hodges*, 234 Ill. 2d 1, 9 (2009)).

¶ 13 " '[I]ssues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived.' " *Allen*, 2015 IL 113135, ¶ 20 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002)). Thus, the trial court correctly determined that all of defendant's claims relating to ineffective assistance of counsel were *res judicata* due to having been considered on direct appeal, or they were waived as they had not been raised on direct appeal. "However, defendant's ineffective assistance of appellate counsel claim is not subject to waiver because he could not raise the issue in his direct appeal." *People v. Todd*, 2019 IL App (3d) 170153, ¶ 11 (citing *People v. Flores*, 153 Ill. 2d 264, 281-82 (1992)).

¶ 14 In *Todd*, we explained:

"At the first stage of postconviction proceedings, an ineffective assistance of appellate counsel claim must make an arguable assertion that (1) counsel's performance fell below an objective standard of reasonableness and (2) defendant was prejudiced. [Citation.] Defendant's

contention that appellate counsel was ineffective for failing to raise [an ineffective assistance of trial counsel] issue required defendant to allege facts and law to show that counsel's failure was objectively unreasonable and counsel's decision prejudiced defendant. [Citation.] Appellate counsel is not required to brief every conceivable issue and is not incompetent for refraining from raising an issue that is without merit, unless counsel's appraisal of the merits is patently wrong. [Citation.]" *Todd*, 2019 IL App (3d) 170153, ¶ 12.

Here, defendant argues counsel was ineffective for failing to file a motion to suppress the four eyewitnesses' identifications of defendant as the person who shot and killed Mr. Williams, as such a motion arguably would have been granted. Defendant argues the identifications were the product of unnecessarily suggestive show-up procedures, and appellate counsel was ineffective for failing to claim trial counsel was ineffective on this basis. We disagree.

¶ 15        Whether the two different show-up procedures used by the police were unnecessarily suggestive is at the heart of this claim. "Illinois courts have long held that an immediate showup identification near the scene of the crime is proper police procedure." *People v. Thorne*, 352 Ill. App. 3d 1062, 1076 (2004) (citing *People v. Lippert*, 89 Ill. 2d 171, 188 (1982); *People v. McKinley*, 69 Ill. 2d 145, 152 (1977); *People v. Manion*, 67 Ill. 2d 564, 570–71 (1977)). The central question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972). IPI Criminal No. 3.15 states the law for assessing the reliability of witness identification testimony. *People v. Jones*, 2019 IL App (3d) 160268, ¶ 38 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007)). IPI Criminal No. 3.15 instructs:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation." IPI Criminal No. 3.15 (approved July 28, 2017).

¶ 16    Witnesses Sandra Kuntz, Dana Berg, and James Prince testified they observed the incident from across the street through an open window in the second-floor office of Berg, the principal of the Aquinas Catholic Academy (Aquinas). None of them saw defendant's face because he wore a blue hoodie with the hood up at the time of the incident. The incident began at about 8:30 a.m. on Monday, June 24, 2013. Kuntz, Berg, and Prince watched defendant and Williams struggle for 2½ to 3 minutes before the shot rang out. Kuntz was on the phone with the police describing the incident during much of this time. Kuntz and Berg saw defendant pull out a gun. All three testified that a woman exited the house and screamed when she saw the struggle and shooting, and she reentered the house. Defendant then ran into the house and stayed inside briefly. He exited and looked at Williams on the ground. Defendant, wearing a blue hoodie, black jeans, and white tennis shoes, then walked across the street and down the alley next to Aquinas. The three eyewitnesses each identified the clothing defendant had been wearing from a photo exhibit at trial.

¶ 17    Lieutenant David Skelly and Commander Robin Passwater returned to the scene of the shooting after defendant was apprehended. They spoke with the three eyewitnesses at Aquinas, which is directly across the street from 363 East Hickory where the shooting occurred. Passwater had defendant returned to the scene for a show-up procedure, and the squad car was parked in the alley next to 363 East Hickory, slightly diagonal to the front door of Aquinas. Defendant was in the passenger side of the backseat of Officer Finley's marked-and-caged squad car. Skelly initially spoke with the witnesses who described the incident. Sergeant Hartman was also at Aquinas. He separated the witnesses, and they asked to have defendant's hood up for the show-up procedure. At the time defendant was removed from the car, Skelly had a hand on his arm for safety purposes, but defendant was not physically resisting, and Skelly was not forcibly holding him there. Finley and Skelly stood with defendant beside the squad car.

¶ 18    Commander Passwater testified that after speaking with the eyewitnesses at the school, he asked Sergeant Hartman to return defendant to the scene for a show-up identification. He decided to do a show-up because, "[i]t was within the time period. It was quick." The witnesses could only identify defendant's clothing "and it was just the procedure we could use at that point." Passwater did not use a photo lineup because those show only the subject's face and shoulders, and the witnesses could not identify the shooter's face. He explained that in-person and photo lineups are not done after a show-up because it may taint later identifications.

¶ 19    Kuntz testified that police arrived soon after the shooting. The police said they had a gentleman and would ask him to step out of the squad car. One-by-one, the officers had Kuntz, Berg, and Prince look out a door at a squad car across the street. Kuntz indicated she wanted the defendant's hood up. Kuntz identified defendant as the person who had the gun. Kuntz said, "[t]hose were the exact clothes that the person had on," and she was "100 percent sure" of her

identification. Defendant was about the same distance away as he had been during the shooting incident. The show-up occurred about 15 to 20 minutes after the shooting, and Kuntz did not view a lineup.

¶ 20        Berg testified that police officers spoke with Berg, Kuntz, and Prince. Each was asked to come to the front door of the school and view a person to see if he matched the description they had given to the police. The squad car was located beside the house where the incident occurred, and officers had defendant step out of the car. The police returned 10 to 12 minutes after the incident. Defendant was about 25 to 30 feet away when Berg viewed him. A nonuniformed detective asked Berg to come to the school's door to see if she recognized the man. Berg identified defendant based on his height, build, and clothing; "it was all the same." Berg was "100 percent sure" defendant was the shooter. Berg was alone with an officer at the time. The other witnesses were in the school gym. Berg did not discuss her identification with anyone, as she had been instructed, and one could not hear sounds from the show-up in the gym.

¶ 21        Prince testified that soon after the shooting, a squad car arrived, and Prince, Berg, and Kuntz were asked if they could identify a person police had apprehended. They had the witnesses go to the gym. One at a time, they were called to the front door of Aquinas, and the person stood with his hood up at a marked squad car across the street from the school. The person had the same height, build, and clothing as the shooter. Prince was certain of his identification. The shooting incident had lasted about three minutes, and the police arrived with defendant about 10 minutes later. Before the show-up, Prince told police he had not seen the man's face, and the officer asked only "if that was the person with the same clothes."

¶ 22        Sergeant Randy Hartman testified that at about 8:55 a.m., he advised Kuntz they were going to conduct an in-person show-up. She had no obligation to identify anyone, and she was not

to share any information with anyone. Kuntz, Prince, and Berg stated the shooter had a hood on, and they had not been able to see his face. Hartman had Skelly remove the defendant from the squad car and pulled his hood up. Hartman stepped inside Aquinas and opened a door. He asked Kuntz to step up and view defendant. She immediately identified that he had been involved in the shooting. Hartman took Kuntz to the school's gym. He repeated the same procedure with Prince. Prince also identified defendant as the person who had the handgun and was involved in the shooting. Hartman advised Kuntz and Prince not to speak with each other. Hartman repeated the procedure with Berg. She immediately identified defendant as the person who had the silver handgun.

¶ 23    Courts have approved show-up identifications under certain circumstances, such as when a witness had an excellent opportunity to observe the offender during the offense or where prompt identification is necessary for the police to determine whether to continue their investigation. *People v. Brackett*, 288 Ill. App. 3d 12, 19-20 (1997) (citing *Manion*, 67 Ill. 2d at 569-70); *People v. Hughes*, 259 Ill. App. 3d 172, 176 (1994). The testimonies of Kuntz, Berg, and Prince show they each had an excellent opportunity to observe defendant for several minutes as the crime occurred. This was a murder investigation, and testimony showed defendant was quickly captured after a chase through the nearby area. Therefore, a prompt identification was necessary to determine whether the police needed to continue their search. We conclude that under the totality of the circumstances the testimonies of the three eyewitnesses demonstrated their independent identifications of defendant as the shooter were reliable under the IPI Criminal No. 3.15 factors, and the show-up procedure was not unduly suggestive.

¶ 24    "The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may

be available ***." *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382; *Clemons v. United States*, 133 U.S. App. D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (Leventhal, J., concurring); cf. *Gilbert v. California*, 388 U.S. 263, 273, 87 S. Ct. 1951, 1957 (1967); *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961). Evidence of such a confrontation does not in every instance offend due process. *Id*. "[T]he weight to be given identification evidence, like most factual determinations, is presumptively a jury question." *People v. Moore*, 266 Ill. App. 3d 791, 796 (1994). Evidence of a show-up identification is excluded, "[o]nly where a pretrial encounter resulting in an identification is 'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial likelihood of irreparable misidentification.' " *Id.* at 796-97 (citing *Biggers*, 409 U.S. at 196-97).

¶ 25    Commander Passwater's testimony shows a more reliable procedure was not available for Kuntz, Berg, and Prince. None of them had seen defendant's face. Physical and photo lineups generally require a witness to have done so. In the instant case, to conduct an in-person lineup, the police would have had to assemble multiple persons of similar height and build and dress them all in similar color and style clothing as the defendant. This would have been unreasonable given the need for haste in identifying and apprehending Williams's killer. We conclude as to Kuntz, Berg, and Prince that the show-up procedure was not unnecessarily or impermissibly suggestive, and it did not produce a likelihood of misidentification. Additionally, each witness informed the jury that they did not see the defendant's face because his hood was up. Thus, the jury considered that the identifications were based on build and specific clothing immediately after the shooting.

¶ 26    Witness Rebecca Hoover presents a different situation where she saw defendant's face. At the time of the shooting, the 911 dispatcher told Hoover, "they do have a guy in custody, so you're just fine, okay." Defendant argues that given this exchange and Hoover's initial identification of the shooter by the name "Newbie," her later identification of defendant was tainted. We disagree.

¶ 27    Hoover testified that defendant had twists in his hair and wore a blue hoodie. She had barely seen defendant's face, but she was certain defendant had shot Williams. Shortly after the shooting, Hoover provided the name "Newbie" to the 911 dispatcher. She identified the shooter by this name to Sergeant Hartman during a later interview. She explained his was the only name she could think of at the time. About 15 minutes after the shooting, Hoover informed officers Newbie "was not the person that shot Nelson [Williams], that I said that like in shock." Hoover testified, "it registered in my brain that that could not have been [Newbie] because he didn't have twists in his hair, and then I thought of a different name[,] and I told them Kamron."

¶ 28    Sergeant Hartman met Hoover at the police station around 9:15 a.m. and asked her to do a show-up identification. He gave her the same instructions he had given to Kuntz, Berg, and Prince, and he left her with Officer Lindgren in a room with a window. Hartman brought defendant into a hallway about 20 feet away and in plain view, and Lindgren gave an okay sign. Defendant was still wearing the blue hoodie. Hartman then interviewed Hoover, and she said defendant had shot Williams. When Hartman met with Hoover prior to the show-up, she could not recall what the shooter had been wearing. She identified him by the name "Newbie." Hoover had seen both defendant and Newbie around the neighborhood, but she did not know either of them well. As to Hoover, we conclude the show-up procedure was not unnecessarily or impermissibly suggestive and did not produce a likelihood of misidentification.

¶ 29    Considering the five IPI Criminal No. 3.15 factors, Hoover had a clear opportunity to view defendant at the time of the offense. She was attentive at the time where she witnessed defendant shoot her fiancé. She was able to see his face and that he wore twists in his hair. Hoover initially misstated defendant's name but corrected herself within minutes. She explained that Newbie and defendant have a similar look, and she is not well acquainted with either man. When she saw his

face at the show-up, Hoover was absolutely certain defendant was shooter, and only minutes had elapsed between the shooting and her show-up identification of defendant.

¶ 30        Under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984), a defendant must show that trial and appellate counsel performed deficiently and that a reasonable probability exists that, but for each counsel's deficient performance, the result of the trial and appeal would have been different. *People v. Roberts*, 2021 IL App (3d) 190445, ¶ 42 (citing *Strickland*, 466 U.S. at 694). "A strong presumption exists that counsel's decision to not file a motion to suppress is a sound trial strategy, such that that decision cannot be deemed deficient performance." *Id.* (citing *People v. Gayden*, 2020 IL 123505, ¶ 28). Most importantly:

> " 'where an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed.' " *Id.* (quoting *People v. Henderson*, 2013 IL 114040, ¶ 15).

¶ 31        We conclude the show-up identification procedures used in the instant case were not unnecessarily or impermissibly suggestive, and they did not produce a substantial likelihood that the witnesses misidentified defendant. Thus, a motion to suppress the show-up identifications of defendant would not have been successful. Even if a motion to suppress had been successful, the eyewitnesses still would have been able to testify as to what they had witnessed. Hoover would have conclusively identified defendant as the shooter, and all four would have testified that defendant had been wearing the clothing shown in State's exhibit No. 9 at the time of the shooting. Evidence showed defendant had the gun on his person that matched the fired casing found next to

Williams's body. Further, defendant tried to escape from the police department. "[T]he jury could properly consider his escape as evidence tending to show guilt." *People v. Gaines*, 88 Ill. 2d 342, 366 (1981) (citing *People v. Gambino*, 12 Ill. 2d 29, 32 (1957)); *People v. Harper*, 36 Ill. 2d 398, 403-04 (1967). Therefore, the outcome of the trial would not have been different had the show-up identifications been suppressed. We conclude that defendant's counsel was not ineffective for failing to move to suppress the show-up identifications of defendant as the shooter. Consequently, we find appellate counsel was not ineffective for failing to raise an issue of trial counsel's ineffectiveness on this basis on appeal.

¶ 32     We observe the State argues three cases are factually comparable to the instant case: *Lippert*, 89 Ill. 2d 171; *People v. Hall*, 134 Ill. App. 3d 961 (1985); and *People v. Ruffolo*, 64 Ill. App. 3d 151 (1978). Defendant argues these cases are factually distinguishable and do not support that trial counsel was effective. We agree that these three cases are not factually comparable. In each case, the eyewitnesses were the victims. They had an opportunity to clearly see the defendants' faces. Neither case involved a murder in which a subject was detained within minutes of the crime. However, they do not support that the show-up procedures used in the instant case were not proper.

¶ 33     Defendant next argues his postconviction petition sufficiently alleged the gist of a constitutional claim that appellate counsel was ineffective for failing to argue on direct appeal that his trial counsel had been ineffective for failing to offer IPI Criminal No. 3.11 in its entirety. Defendant argues Ms. Hoover's recorded 911 call was admissible as substantive evidence independent of its use for impeachment purposes. The State argues Hoover's misidentification of the shooter was admitted in the State's case-in-chief as substantive evidence, not as impeachment, IPI Criminal No. 3.11 should not have been given at all, and defendant received a benefit to which

- 14 -

he was not entitled. The State argues the claim that counsel provided ineffective assistance by failing to ask that the jury be given the second portion of IPI Criminal No. 3.11 was nonmeritorious, and appellate counsel cannot be found ineffective for not raising a nonmeritorious issue on direct appeal.

¶ 34     Hoover testified that she initially told the 911 dispatcher and the police that Newbie had shot Williams, but she corrected herself at the police station and provided the name "Kamron." Sergeant Hartman also testified that Hoover initially told him the shooter's name was Newbie, but she later said she had been mistaken about that name. A witness's prior statement is inconsistent with his or her trial testimony when the prior statement has a tendency to contradict the trial testimony. *People v. Zurita*, 295 Ill. App. 3d 1072, 1077 (1998) (citing *People v. Lee*, 243 Ill. App. 3d 745, 749 (1993)). Ms. Hoover did not testify inconsistently with her prior statements to the 911 dispatcher and police regarding the name of the shooter. Hoover admitted she had misidentified the shooter initially, but she corrected herself minutes later. Thus, her prior statements did not have even a tendency to contradict her trial testimony.

¶ 35     The record shows the giving of IPI Criminal No. 3.11 was not warranted at all. If giving IPI Criminal No. 3.11 affected the trial, it would have favored defendant where it would have allowed the jury to give Hoover's testimony extra scrutiny. "An error in a jury instruction is harmless if the result of the trial would not have been different if the proper instruction had been given." *People v. Ward*, 187 Ill. 2d 249, 265 (1999) (citing *People v. Johnson*, 146 Ill. 2d 109, 137 (1991)). Reversal is not required where a jury instruction error does not shift the burden to defendant or make it easier for the State to prove its case. *People v. Johnson*, 254 Ill. App. 3d 74, 79 (1993). We conclude trial counsel was not ineffective for not asking to have the second

paragraph of IPI Criminal No. 3.11 given to the jury. Consequently, appellate counsel could not have been ineffective for not arguing on appeal that trial counsel was ineffective on this basis.

¶ 36                                    III. CONCLUSION

¶ 37        For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 38        Affirmed.

¶ 39        JUSTICE HOLDRIDGE, specially concurring:

¶ 40        I join the majority's judgment. I write separately to clarify my position on one aspect of the majority's analysis. Unlike the majority, I believe that the defendant has raised a colorable claim that the witness identifications of the defendant in this case were impermissively suggestive. Nevertheless, I agree with the majority's conclusion that the defendant cannot show that he was arguably prejudiced by his counsel's alleged failures to address this issue at trial or on appeal. As the majority notes, even if the allegedly suggestive identifications had been suppressed, the eyewitnesses would have testified as to what they had witnessed, which would have strongly supported a finding that the defendant was the shooter. Moreover, the fact that the gun that fired the bullets at the crime scene was found on the defendant shortly after the shooting provided overwhelming evidence of the defendant's guilt.

¶ 41        Even assuming that the defendant's trial counsel erred by not moving to suppress the identifications, any such error was inarguably harmless. It is therefore not arguable that the defendant's appellate counsel erred by failing to raise the issue on appeal. I agree with the majority that the trial court's dismissal of the defendant's postconviction petition at the first stage should be affirmed.

¶ 42        PRESIDING JUSTICE McDADE, dissenting:

¶ 43     The majority affirms the circuit court's summary dismissal of Taylor's postconviction petition, holding that his claims of ineffective assistance of trial and appellate counsel regarding eyewitness identifications were frivolous and patently without merit. I disagree with that conclusion and therefore respectfully dissent.

¶ 44     There is inherent tension between the law as set forth by the majority and the majority's analysis of what is at issue in this case. On one hand, the majority acknowledges that this case involves first-stage postconviction review, which requires only that a petitioner satisfy a low threshold to survive summary dismissal. *Supra* ¶ 12. On the other hand, the majority engages in a lengthy analysis that addresses the entirety of the merits of Taylor's claim. *Supra* ¶¶ 14-32. I do not believe the majority's analysis is appropriate, as it is not until the second stage of postconviction proceedings that a defendant (1) may receive the benefit of appointed counsel to review his or her petition and (2) is required to make a substantial showing of a constitutional violation (*People v. Cotto*, 2016 IL 119006, ¶¶ 27-28 (citing, among other authorities, 725 ILCS 5/122-4, 5 (West 2010)).

¶ 45     In his postconviction petition, Taylor stated:

        "Petitioner trial counsel was ineffective assistance of counsel for failure to file a motion to suppress Identification, Petitioner was identified in a show up by 3 witnesses from the school based upon a blue hoodie, no facial identification. Petitioner was removed from a police vehicle in hand cuffs and the hood was pulled onto his head for this suggestive show up. The courts was not given the opportunity to rule on whether this suggestive show up was admissible or not because Petitioner counsel did not file a motion to suppress identification. The show up at the police station was clearly inadmissible Rebecca Hoover identified the shooter to the 911 operator as Newbie, the operator told her

- 17 -

they got 'the guy' and when she came to the police station she identified Newbie as the shooter to Detective Hartman. Then when Hartman brought the Petitioner to the window Rebecca Hoover identified the Petitioner. Rebecca Hoover was also impeached."

Taylor further claimed that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness.

¶ 46    I would find that the allegations in Taylor's petition were sufficient to raise arguable issues of deficient performance and prejudice. It is arguable that the police conducted unnecessarily and/or impermissibly suggestive show-ups in this case. It is also arguable that the identifications resulting from these show-ups may have tipped the scales against Taylor. Thus, it is further arguable that trial counsel was ineffective for failing to move to suppress the identifications and that appellate counsel was ineffective for raising the issue of trial counsel's ineffectiveness. Accordingly, I would hold that Taylor's postconviction petition met the low burden needed to advance past the first stage of postconviction proceedings. See *People v. Smith*, 2023 IL App (1st) 221496, ¶¶ 37-38 (discussing the allegations contained in a postconviction petition and briefly analyzing whether those allegations presented an arguable issue of ineffective assistance of appellate counsel). This case should be reversed and remanded for second-stage postconviction proceedings. See *id.* ¶ 38.

¶ 47    For the foregoing reasons, I respectfully dissent.