2025 IL App (1st) 230037-U

No. 1-23-0037

First Division
June 9, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 17 CR 11231 |
| | ) | |
| TIMOTHY GORDON, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's murder convictions are affirmed where the State presented sufficient evidence to prove his guilt beyond a reasonable doubt, the trial court did not err in responding to jury questions, and the prosecution did not make improper comments during closing arguments and rebuttal.

¶ 2   On June 30, 2017, Javon Jackson, Sedrick Ringer, and John Hunter were shot and killed in a hail of gunfire on South Wells Street in Chicago. Following separate but simultaneous jury trials, defendant Timothy Gordon and his cousin, codefendant Jayton Dorsey, were convicted of the

murders and sentenced to mandatory terms of life in prison.[1] Defendant now appeals, arguing that the State failed to prove his guilt beyond a reasonable doubt. He also argues that the trial court erred in responding to jury questions asked during deliberations, and that the prosecution made improper comments during closing arguments and rebuttal. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The evidence showed that just before 9 p.m. on June 30, 2017, Jackson, Ringer, and Hunter were killed while standing outside the building at 5760 South Wells Street. Jackson and Ringer each suffered numerous fatal gunshot wounds. Hunter's body was discovered in the building's vestibule the next day having suffered a single fatal gunshot wound to the pelvis.

¶ 5     Michael Graves testified that he heard the gunshots from his home next to 5760 South Wells. As Graves approached his window to check on the matter, he saw "a couple muzzle flashes" and "maybe two people" shooting outside. By the time Graves got closer to his window, the shooters had fled. Graves did not see the shooters' faces and was able to describe them only as "African-American males."

¶ 6     Detective Mark Campbell testified that he and his partner, Officer Krista Hinton, were patrolling the area in a marked police vehicle when the shooting began. Upon hearing the gunshots, they activated their emergency equipment and drove toward the source of the noise. As they approached 5760 South Wells, Detective Campbell saw "two or three males" firing guns on the sidewalk. The shooters then ran southbound toward 58th Street. As the officers pursued them, Detective Campbell saw a white Pontiac Grand Prix parked on 58th Street with two men who "looked like" the shooters inside.

---

[1] Dorsey is not a party to this appeal. He has a separate appeal pending before this court in Case No. 1-23-0035.

¶ 7    As the officers passed the Grand Prix, it immediately sped off and drove onto the Dan Ryan Expressway. The officers turned their vehicle around and gave chase while the Grand Prix drove recklessly at a high speed. Eventually, the Grand Prix lost control and crashed by a grassy hill on the side of the expressway. Detective Campbell saw two people from the Grand Prix run up the hill and climb a barbed wire fence around an Illinois Department of Transportation (IDOT) parking lot. With the aid of a police helicopter, defendant and Dorsey were subsequently found and arrested while attempting to hide on a third floor balcony of the building at 146 West 66th Street.

¶ 8    At trial, the State introduced video footage from Detective Campbell's dashboard camera, the police helicopter, private security cameras, and body-worn cameras from other officers showing defendant and Dorsey's flight and arrest. The State also introduced numerous photographs of the evidence, many of which were taken on the night of the shooting by Sergeant Jerry Doskocz, who was then an evidence technician. In particular, Sergeant Doskocz photographed the Grand Prix after it crashed on the side of the expressway. Sergeant Doskocz confirmed that he photographed the Grand Prix as it appeared prior to any processing.

¶ 9    Sergeant Scott Shepard testified that he was the lead detective in the investigation. Following the shooting, Sergeant Shepard reviewed the evidence and coordinated other officers in canvassing the area for potential witnesses. On cross-examination, defense counsel questioned Sergeant Shepard about an eyewitness named Qwanda Curry. Sergeant Shepard acknowledged that Curry was shown photographic lineups featuring both defendant and Dorsey, but was unable to identify either as one of the shooters. Curry also later viewed a live lineup including defendant, but stated that "none of the shooters were in that lineup." Neither party called Curry to testify at trial.

¶ 10     The forensic evidence showed that after defendant and Dorsey's arrest, police recovered a .45-caliber handgun from the backseat of the crashed Grand Prix and a .40-caliber handgun from the IDOT parking lot through which they fled. Police also recovered 11 .40-caliber cartridges cases, 16 .45 caliber cartridge cases, and numerous 9-millimeter cartridge cases from the murder scene. Forensic firearms examiner Jennifer Sher analyzed this evidence and determined that the firearm from the Grand Prix was the source of all .45-caliber cartridge cases left at the scene and that the firearm from the IDOT parking lot was the source of all the .40-caliber cartridge cases left at the scene. Sher further concluded that the 9-millimeter cartridge cases found at the scene were all fired by the same firearm. However, no 9-millimeter weapon was ever recovered in this case.

¶ 11     Cynthia Prus, a forensic scientist specializing in latent fingerprint examination, identified Dorsey's fingerprint on the firearm recovered from the IDOT parking lot. Prus was unable to identify defendant's fingerprints on either recovered firearm.

¶ 12     Scott Rochowicz also testified for the State as an expert in gunshot residue (GSR) testing. Rochowicz explained that GSR is a "general term that refers to all the heat, vapors, and particulate material that are emitted from a firearm when it is discharged." GSR testing can determine whether a subject likely discharged a firearm or was in the environment around the discharge of a firearm. GSR testing focuses on three elements associated with the discharge of a firearm: lead, barium, and antimony. A particle containing either one or two of these elements is considered a "consistent particle," and may be helpful in determining whether the subject discharged a firearm. A particle containing all three elements is known as a "tricomponent particle" and indicates that the test subject was in the environment of a discharged firearm. However, the failure to detect a tricomponent particle in a sample generally indicates either a negative or inconclusive result. Where there are no tricomponent particles but an "elevated number of consistent particles," the

result is considered inconclusive. Where there are no tricomponent particles and a "low amount of consistent particles," the result is negative.

¶ 13    In this case, Rochowicz tested the samples taken from defendant and Dorsey's hands shortly after their arrest, as well as defendant's T-shirt that was caught on the fence leading into the IDOT parking lot. Rochowicz concluded that Dorsey's right hand, which was his nondominant hand, tested positive for GSR. Specifically, Rochowicz stated that Dorsey's right hand "contained a minimum of three of the tricomponent particles and additional consistent particles." However, defendant's hands and shirt tested negative for GSR, meaning that he "may not have discharged a firearm with either ha[n]d but if he did then those particles were either not deposited, removed by activity or not detected by [the] procedure." Rochowicz acknowledged that a variety of activities such as running, climbing a fence, bleeding, or touching other surfaces could remove GSR from a person's hands. The evidence showed that defendant was arrested with bloody hands after climbing the barbed wire fence into the IDOT parking lot. Rochowicz also explained that other factors could affect whether or how much GSR is emitted, including the caliber of the firearm, the quality of its construction, or the type of ammunition used.

¶ 14    Defendant testified in his own defense. He admitted that he was a passenger in the white Grand Prix and fled from the police, but denied any knowledge of or involvement in the shooting. Instead, defendant stated that on the night of the shooting, he attended a family gathering at his aunt's house. There, he spoke to Dorsey and another cousin, Marquise Banks. At some point, defendant asked Banks if he had any marijuana. Banks replied that he was about to go out and get some and that defendant could come with him if he wanted.

¶ 15    Defendant then left his aunt's house in the white Grand Prix along with Banks, Dorsey, and a person defendant knew only as "Cam." According to defendant, Dorsey was the driver, Cam

was in the front passenger's seat, Banks sat behind the driver, and defendant sat behind the front passenger. Defendant did not know where they were going, but they eventually parked around the corner from 5760 South Wells. Banks told defendant to stay in the car while the others went to get the marijuana. Defendant thought that this was "weird," but stayed behind.

¶ 16    Defendant then lost sight of the others as they turned the corner. Moments later, defendant heard "a lot of gunfire" with "at least 30" shots fired. Defendant crouched down behind the front passenger's seat. He was surprised and fearful that his cousins were the ones being shot at.

¶ 17    After the shooting stopped, the others returned to the car and took the same seats as before. Defendant now noticed that Banks had a gun. Defendant identified the .45-caliber gun recovered from the backseat of the Grand Prix as the gun he saw Banks carrying. Upon seeing the police, Banks banged on the backseat and yelled at Dorsey to drive. Defendant was "shocked" and did not say anything. Dorsey sped away while a police car followed them with its lights on. After Dorsey crashed the Grand Prix on the expressway, "everybody just jumped out and started running." Defendant also ran because he was scared and "didn't know what to do." Defendant followed Dorsey over a barbed wire fence, which bloodied his hands and ripped off his shirt as he jumped over. Dorsey dropped a different gun as they ran, which defendant identified in court as the .40-caliber firearm recovered from the IDOT parking lot.

¶ 18    On cross-examination, the State questioned defendant about a photograph showing "a pile of clothes and garbage" found in the backseat of the Grand Prix. Defendant testified that those items were on the floor when he was in the Grand Prix and he did not know how they moved onto the seat. Defendant also acknowledged that Dorsey was visiting from out of town for the funeral of a mutual cousin who had been murdered earlier that month. However, defendant stated that the gathering at his aunt's house prior to the shooting was "[n]ot technically" to commemorate the

cousin's death and it was not unusual for family to congregate at the aunt's house. When asked to explain what he meant by "not technically," defendant replied, "Well, it wasn't really—because we had a get together already. So my cousin—my cousin [Dorsey] was down from college for a get together for the passing."

¶ 19     The defense rested after presenting defendant's testimony. At the jury instruction conference, the State offered Illinois Pattern Jury Instructions, Criminal No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI No. 5.03), which provides that:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

Defendant objected, arguing that the evidence was insufficient to sustain a conviction under a theory of accountability because it showed he was merely present at the scene and fled. As such, defendant offered three alternative non-IPI instructions regarding a defendant's mere presence and flight. Specifically, defendant proposed instructing the jury either that (1) "[A] defendant's presence at the scene of the crime, even when coupled with flight from the scene, is not enough to prove him legally responsible;" (2) "[T]he presence of a defendant at or in the vicinity of the scene of a crime does not make him legally responsible for the conduct of another. Even consent or knowledge by the defendant that a crime was being committed would not constitute aiding and abetting;" or (3) "[T]he mere presence of a defendant at the scene of a crime, even when the

defendant knows that a crime is being committed is insufficient by itself to establish accountability."

¶ 20 The trial court rejected defendant's non-IPI proposals, reasoning that they were "not neutral" because they could be falsely perceived by the jury "as a communication by the court that [mere presence and flight] is all that the evidence has established." The court also opined that the proposed IPI instructions accurately and succinctly conveyed the applicable law. Thus, the court instructed the jury on IPI No. 5.03 and did not give any of defendant's alternative proposals on the law of accountability.

¶ 21 During closing arguments, the State's theory was that defendant was the shooter with the .45-caliber firearm found in the backseat of the Grand Prix, Dorsey was the shooter with the .40-caliber firearm found with his fingerpints in the IDOT parking lot, and an unknown third person was the shooter with the 9-millimeter firearm that was never recovered. In addressing the results of the GSR testing, the State acknowledged that defendant's hands and shirt tested negative whereas Dorsey's right hand tested positive with "the minimum of these three microscopic particles on his hand." However, the State posited the lack of GSR on defendant's hands and shirt could be explained by removal during his flight from police. According to the State, this was consistent with the negative result for Dorsey's left hand, leading to "the reasonable conclusion *** that a lot of the gunshot residue was removed from Mr. Dorsey's hands as well." The State went on to discuss the inherent inconclusiveness of GSR testing, arguing that "[s]ometimes *** scientific tests don't give us the full answer," as when rapid COVID-19 tests gave false negatives when the Omicron variant spread.

¶ 22 The defense argued in closing that defendant's innocence was proven by the lack of forensic evidence tying him to the shooting. Defense counsel also noted that it was the defense,

not the State, that elicited Sergeant Shepard's testimony that Curry did not identify defendant as one of the shooters. Counsel implored the jurors to ask themselves why the State choose not to call Curry and contended that "Curry confirms what [defendant] is saying when she says none of the shooters are out there."

¶ 23 In rebuttal, the State addressed, among other things, its decision not to call Curry as a witness. In particular, the State acknowledged that Curry failed to identity defendant but contended that she did not get a good look at the shooters because "[i]t happened quick." The State further argued that "[t]he fact that she wasn't able to identify [defendant] doesn't mean that he didn't do it." Finally, over defendant's objection, the State noted that defendant "could have subpoenaed Quanda Curry as well," but chose not to do so.

¶ 24 During deliberations, the trial court received the following note from the jury regarding the law of accountability:

"With respect to 'or one for whose conduct he is legally responsible' the jury has a clarification question on the law. One, if the defendant remains in the vehicle but knew of the presence of the firearm would this make him 'legally responsible' and lead to a guilty verdict even if he didn't pull the trigger? Two, if the defendant remained in the vehicle and knew a shooting would take place could this make him 'legally responsible' leading to a guilty verdict even if he didn't pull the trigger."

¶ 25 The State urged the court to respond that the jury had received instructions on the law and should continue to deliberate. Defendant disagreed, contending that the jury was asking two purely legal questions to which the court should answer "no." The court rejected defendant's position, opining that a simple "no" would not "take into consideration all sorts of other facts that the jury's heard which they may conclude are the truth." The court also stated that answering the question

would be interpreted as "presuming that they are factually correct." Ultimately, the court instructed the jury "You have heard the evidence. You've been instructed on the law. Continue your deliberations."

¶ 26    The following day, the jury sent another note requesting a copy of defendant's testimony, which was given. After a third note indicated that a juror had conducted outside research on the internet, the court replaced that juror with an alternate and instructed the jury to begin deliberations anew. Finally, the court received a fourth note requesting a copy of Rochowicz's testimony, which was also given. Later that day, the jury returned a verdict finding defendant guilty of all three murders.

¶ 27    Defendant was subsequently sentenced to a mandatory term of life in prison. He filed a motion to reconsider that sentence, which was denied. This appeal followed.

¶ 28                                II. ANALYSIS

¶ 29                        A. Sufficiency of the Evidence

¶ 30    On appeal, defendant first argues that the State failed to prove his guilt beyond a reasonable doubt. Specifically, he contends that the evidence against him was inadequate where no eyewitness identified him as one of the gunmen and no forensic evidence tied him to the shooting. Rather, defendant maintains that the State's evidence amounted to his mere presence at the crime scene and flight from the police, which is insufficient to convict him.

¶ 31    When considering a challenge to the sufficiency of the evidence, a reviewing court asks whether, viewing all the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. Under this standard, all reasonable inferences from the evidence must be drawn in favor of the prosecution. *People v. Newton*, 2018 IL 122958, ¶ 24. We will not substitute our

judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Jones*, 2023 IL 127810, ¶ 28. In weighing the evidence, the trier of fact is not required to disregard inferences which flow naturally from the evidence, nor must the trier of fact seek out all possible explanations of the defendant's innocence and raise them to the level of a reasonable doubt. *Newton*, 2018 IL 122958, ¶ 28. A conviction will not be reversed on appeal for insufficient evidence unless the evidence is "so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 32    Here, as established by the spent cartridges cases left at the crime scene, there is no dispute that there were three shooters responsible for the murders in question. The only open question is the identity of those shooters. To that end, defendant argues that the evidence did not establish that he was one of the shooters where he testified that he had no prior knowledge of the shooting and no forensic evidence proved he fired one of the recovered murder weapons. However, the State need not necessarily present forensic evidence, as a conviction can be supported by circumstantial evidence alone where it satisfies proof of the elements on an offense beyond a reasonable doubt. *People v. Smith*, 2020 IL App (3d) 160454, ¶ 34.

¶ 33    Our review of the circumstantial evidence in this case shows that a rational trier of fact could conclude that defendant was one of the gunmen beyond a reasonable doubt. Defendant was caught all but red-handed. Police in the area heard the gunshots and located the shooters' white Grand Prix almost immediately. The Grand Prix led the police on a high speed chase before crashing on the side of the Dan Ryan Expressway. Defendant and Dorsey then exited the vehicle, hopped a barbed wire fence, and were quickly apprehended while trying to hide. The police recovered two of the three murder weapons, one from the backseat of the Grand Prix next to where

defendant was seated, and the other from the IDOT parking lot through which defendant and Dorsey ran. Fingerprint and GSR evidence also later linked Dorsey to the firearm recovered from the parking lot.

¶ 34    To be sure, the crux of defendant's argument remains that no similar physical or eyewitness evidence established that he handled one of the murder weapons. However, such evidence was unnecessary in light of the significant circumstantial evidence detailed above. Additionally, while defendant points out that his mere presence and flight from the scene is insufficient to establish accountability for an offense, the jury was free to consider these factors along with defendant's failure to report the offense and his continued close association with Dorsey following the shooting. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. Video evidence admitted at trial proved that defendant and Dorsey ran from the Grand Prix together, climbed a barbed wire fence together, and were ultimately apprehended while hiding from the police together. Indeed, defendant admitted as much during his trial testimony.

¶ 35    We also note that while defendant characterizes his innocent explanations as "unimpeached," the jury was not required to accept defendant's self-serving testimony as to why he was in the Grand Prix with the shooters seconds after the murders. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 52. It was the jury's role to resolve any conflicts in the evidence and determine which witnesses to believe. *People v. Walls*, 2022 IL App (1st) 200167, ¶ 29. A review of the record shows several potential reasons why the jury did not accept defendant's testimony. First, we agree with the State that it strains credulity to believe that defendant's cousins would invite him to a shooting under the guise of buying marijuana. Defendant himself conceded that it was "weird" that Banks told him to wait in the car while the others left to commit the murders. The evidence also undermines defendant's testimony that there were four occupants in the Grand Prix.

For example, photographic evidence shows that only three doors were open after the occupants fled, undermining defendant's theory of a fourth occupant. The photographs also showed various items on one of the rear seats, again suggesting that there were at most three occupants. Although defendant testified that these items were on the floor when he was in the Grand Prix, this was contradicted by Sergeant Doskocz's testimony that the photographs were taken before police entered the vehicle for processing.

¶ 36    In short, the State presented sufficient circumstantial evidence to establish defendant's involvement in the shooting beyond a reasonable doubt. The jury, as the trier of fact, was not required to accept defendant's alternative version of events or elevate his testimony to the level of reasonable doubt. Taking the evidence in the light most favorable to the State, as we must, we therefore reject defendant's argument that the State failed to prove his guilt beyond a reasonable doubt.

¶ 37                              B. Jury Instructions

¶ 38    Defendant next argues that the trial court erred in instructing the jury on the law of accountability. More specifically, he contends that the court should have given one of his three tendered non-IPI proposals essentially informing the jury that a defendant's mere presence at and flight from the crime scene is insufficient to establish his guilt under a theory of accountability.

¶ 39    The purpose of jury instructions is to convey to the jury the correct legal principles so that the jury can arrive at the proper conclusion based on the law and evidence. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 41. Generally, the decision to give a particular jury instruction rests within the sound discretion of the trial court, and the court's decision will not be reversed on appeal absent an abuse of that discretion. *People v. McDonald*, 2016 IL 118882, ¶ 69. A trial court has the discretion to give a non-IPI instruction in a criminal case provided that instruction is "accurate,

simple, brief, impartial, and free from argument." *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 50. However, an IPI instruction should be given where one is available on the topic and accurately states the law. *Id.* "An abuse of discretion in the refusal of a non-IPI instruction occurs only where there is no IPI instruction that applies to the subject on which the jury should have been instructed." *People v. Gilliam*, 172 Ill. 2d 484, 519 (1996). Thus, "a trial court does not abuse its discretion by refusing to give a non-IPI instruction if there is an applicable IPI instruction or the essence of the refused instruction is covered by other given instructions." *Id.*

¶ 40    Here, the trial court instructed on IPI No. 5.03, which informed the jury that

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

At the same time, the court refused non-IPI proposals to instruct the jury that either (1) "[A] defendant's presence at the scene of the crime, even when coupled with flight from the scene, is not enough to prove him legally responsible;" (2) "[T]he presence of a defendant at or in the vicinity of the scene of a crime does not make him legally responsible for the conduct of another Even consent or knowledge by the defendant that a crime was being committed would not constitute aiding and abetting;" or (3) "[T]he mere presence of a defendant at the scene of a crime, even when the defendant knows that a crime is being committed is insufficient by itself to establish accountability."

¶ 41    On appeal, defendant contends that the trial court abused its discretion in refusing to give one of his "mere presence" instructions because the defense's theory was that the evidence established only that he was present at the crime scene and fled from the police. Defendant also observes that, after his trial, IPI No. 5.03 was revised to include supplemental paragraphs stating, among other things, that "mere presence at the scene of a crime does not make a person accountable for an offense. You may consider a person's presence at the scene of a crime along with other circumstances when determining accountability." See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Apr. 28, 2023).  The State does not contest that a defendant's mere presence at the scene of the crime, even when coupled with flight, does not alone establish that defendant's accountability for an offense. See *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 67. However, the State contends that the trial court's refusal to give one of defendant's non-IPI proposals was not an abuse of discretion where the given instructions were sufficient to apprise the jury of the relevant legal principles.

¶ 42    We agree with the State. A trial court does not abuse its discretion in refusing a non-IPI instruction where the "essence of the refused instruction is covered by the other given instructions." *Gilliam*, 172 Ill. 2d at 519.  The question thus becomes whether the court's instructions in this case, particularly IPI No. 503, covered the essence of a "mere presence" instruction.

¶ 43    In answering this question in the affirmative, we find *People v. Nutall*, 312 Ill. App. 3d 620 (2000) instructive. There, we held that the trial court did not abuse its discretion by refusing to

give a non-IPI "mere presence" instruction in addition to the IPI instruction on accountability. [2] *Id.* at 632-35. Citing *People v. Thomas*, 175 Ill. App. 3d 521, 529 (1988), we explained that a mere presence instruction is incorporated in IPI No. 5.03 because a defendant who is merely present at the scene does not knowingly solicit, aid, abet, or agree with another person in the commission of an offense. *Nutall*, 312 Ill. App. 3d at 634; see also *People v. Wilson*, 257 Ill. App. 3d 670, 698 (1993) (same). We also noted that the defense's closing argument in *Nutall* carefully surveyed the elements of the offense and accountability in articulating why the defense believed the State failed to satisfy those elements. *Id.* For example, defense counsel argued during closing that the defendant's " 'knowledge that a crime was going to occur is not enough to hold him guilty under the theory of accountability' " and that the defendant instead " 'has to intend to help' " the commission of the offense under the definition of accountability contained in IPI No. 503. *Id.* Accordingly, we found no abuse of discretion where the trial court's instructions "accurately conveyed to the jury the correct principles of law applicable to the evidence in support of [the] defendant's theory and allowed the jury to arrive at a proper conclusion based upon the law and the evidence." *Id.* at 635.

¶ 44 We similarly find that the trial court's IPI instructions in this case adequately informed the jury of the relevant legal principles. The trial court instructed the jury that a defendant is legally accountable for the actions of another only when the defendant (1) has the "intent to promote or facilitate the commission of an offense," and (2) "knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense." See IPI 5.03 (approved Oct. 28, 2016). Clearly, this definition would not encompass a defendant who was

---

[2] *Nutall* involved an earlier version of IPI 5.03. However, the language of that version is identical in all relevant aspects to the version in effect at the time of defendant's trial in this case. *Nutall*, 312 Ill. App. 3d at 632-33.

merely present at the crime scene, or who was merely present and fled. Thus, we reiterate our finding in *Thomas* and *Nutall* that IPI No. 503 incorporated the essence of defendant's non-IPI "mere presence" proposal.

¶ 45 We further note that, as in *Nutall*, defense counsel meticulously interpreted IPI 5.03 in arguing that defendant was not legally accountable. For example, counsel stated, "I'm going to read [IPI No. 5.03 to] you again because I want to be very clear. The fact that he was present when this happened does not equal accountability. Listen very carefully, please, to the instruction." Counsel then reread IPI No. 5.03 for the jury and asserted that defendant "does not do any of those things." Under these circumstances, the jury was aware that defendant's mere presence at the scene was insufficient to establish his accountability for the murders. *Nutall*, 312 Ill. App. 3d at 634-35.

¶ 46 Nor do we find an abuse of discretion in the court's response to the jury notes. Generally, a trial court has a duty to provide instruction where a jury note poses an explicit question or seeks clarification on a point of law arising from facts about which there is some doubt or confusion. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). Nevertheless, a trial court may decline to answer a jury's question under certain circumstances. *Id.* For example, a court a need not answer a jury question where the instructions are readily understandable and sufficiently explain the law, where the question involves an issue of fact, or if providing an answer would potentially cause the court to express an opinion which would likely direct the verdict one way or another. *People v. Brown*, 2015 IL App (1st) 131552, ¶ 42. The decision on how to answer a jury's question falls within the discretion of the trial court, and the court's decision will be disturbed on appeal only if the decision constituted an abuse of that discretion. *Id.*

¶ 47 In this case, the jury asked the trial court whether defendant could be legally responsible for the shooters' actions if he remained in the Grand Prix and either knew the shooters were armed

or that a shooting would occur. Notwithstanding that defendant adamantly denied prior knowledge of any gun or shooting, the defense proposed answering these questions with "no." On appeal, defendant maintains that the trial court "may not have been required to give an outright 'no' to the jury's question, but it was required to give more specific instructions on the law of accountability regarding mere presence." However, the record shows that the trial court was concerned that answering the jury's questions in the negative could be perceived as expressing an opinion on the underlying contested facts. Indeed, the court stated that it was "beyond easy in [its] discretion" to refrain from giving a more specific answer. Consequently, the court responded that the jury had heard the evidence, been instructed on the law, and should continue deliberating.

¶ 48     We find that the trial court's concerns were legitimate, as it is within the court's discretion to decline to answer a jury's question where to do so could cause the court to sway the verdict by expressing an opinion on the facts. *Id.* In any event, as previously explained, the trial court's instruction sufficiently apprised the jury on the law of accountability. Thus, the jury had all the information necessary to apply the law to the facts as they determined them. Because the instructions were readily understandable and adequately explained the law, the trial court did not abuse its discretion in responding to the jury's questions.

¶ 49     We also briefly note that defendant's reliance on the allegedly "analogous" case of *People v. Falls*, 387 Ill. App. 3d 533 (2008), is misplaced because that case is readily distinguishable. In *Falls*, the defendant was acquitted of aggravated battery but convicted of resisting a peace officer where a deputy sheriff testified that the defendant struck him on the hand and then repeatedly pulled her arm away while he attempted to handcuff her. *Id.* at 533-35.  However, the defendant testified that she did not strike the deputy sheriff. *Id.* at 535. During deliberations, the jury first sent a note asking whether a person saying " 'I'm not guilty. Why are you arresting me? Hold on

- 18 -

one second' " was considered resistance. *Id.* at 536. Despite the fact that Illinois law unambiguously required a physical act for the charge of resisting a peace officer, the trial did not answer the question and simply instructed the jury to consult the instructions given at the start of deliberations. *Id.* However, the jury then sent another note asking whether resisting a peace officer " 'c[ould] be verbal' " or required a " 'physical act.' " *Id.* 537. The trial court again refused to answer, instead referring the jury to the original instructions. *Id.*

¶ 50    On appeal, this court found reversible error for two primary reasons. First, we observed that the court's original instructions stated only that the defendant must " 'knowingly resist[]' " a peace officer, and thus did not clearly convey that the law required a physical act. *Id.* at 538. Second, we stated that the jury was obviously unsure about the physical act requirement, as they asked multiple questions about the subject and several jurors later admitted to the trial attorneys that they were confused on that issue. *Id.* We also found it "noteworthy" that the jury acquitted the defendant of battery where the battery instructions clearly required the defendant to have " 'made physical contact' " with the deputy sheriff. *Id.*

¶ 51    In stark contrast, the case at hand presents an entirely different charge and factual scenario. And, as explained, the instructions in this case sufficiently and unambiguously explained the law of accountability. Additionally, there is no evidence that the jury was overly confused by the trial court's response, as they did not raise the subject again in their subsequent jury notes or make any posttrial comments expressing uncertainty about the relevant legal principles. Thus, *Falls* is inapposite and does not require reversal.

¶ 52                                    C. Closing Arguments/Rebuttal

¶ 53    Next, defendant argues that the State made various improper remarks during closing arguments and rebuttal that require reversal of his convictions. Initially, we note that the parties

disagree on the proper standard of review for this issue. Defendant, citing *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), contends that whether a prosecutor's statements are so egregious as to warrant a new trial is a legal issue that is reviewed *de novo*. The State, citing both *Wheeler* and *People v. Blue*, 189 Ill. 2d 99, 128 (2000), observes that our supreme court has applied both a *de novo* standard and an abuse of discretion standard to claims of improper closing arguments. The State maintains that the proper standard in this case is abuse of discretion because the trial court overruled defendant's contemporaneous objections to the challenged remarks.

¶ 54     This court has addressed the apparent conflict between *Wheeler* and *Blue* on numerous occasions. See, *e.g.*, *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 78-79 (collecting cases). However, as we have done many times in the past, we conclude here that we need not resolve any conflict in this case because we would reach the same result under either standard. *Id.* ¶ 81; *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 40; *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 53.

¶ 55     A defendant "faces a substantial burden in attempting to achieve reversal of his conviction based upon improper remarks made during closing argument." *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). The State is afforded wide latitude when making closing arguments. *People v. McAndrew*, 2024 IL App (1st) 230881, ¶ 58. A prosecutor may comment on the evidence presented and any reasonable inferences drawn therefrom, even if those inferences are detrimental to the defendant. *Id.* A prosecutor may also comment on the credibility of witnesses and respond to remarks from the defense which clearly invite a response. *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60. When evaluating the propriety of comments made during closing argument, the arguments of both parties must be examined in their entirety, and the challenged remarks must be viewed in their proper context. *Id.* Additionally, although the State may not raise arguments or assumptions not based on the evidence, even improper remarks do not constitute reversible error

unless they resulted in substantial prejudice to the defendant. *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 124. Substantial prejudice occurs only where improper remarks are a material factor in the defendant's conviction, meaning that the jury could have reached a different verdict but for the remarks or that the reviewing court cannot say that the remarks did not contribute to the conviction. *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 35.

¶ 56    In this case, defendant raises three categories of remarks he contends were in error. First, defendant takes issue with the State's comment that Dorsey had the "three minimum" particles required for a positive GSR test. According to defendant, this remark improperly implied that Dorsey "did not have very many GSR particles on his hands because they were removed by activity," which also explained why defendant's hands and shirt did not test positive for GSR. However, a review of the challenged remarks show that that they were based on the evidence. Rochowicz stated multiple times that analysis of Dorsey's right hand revealed the "minimum of three" elements for a tricomponent particle, which constituted a positive GSR test result. While the wording was arguably inartful, as three was also the maximum number of relevant elements in a tricomponent particle, it is undisputable that the State's comments mirrored the evidence. To the extent the exact wording created an ambiguity, the issue stemmed from Rochowicz's statements, not the prosecutor's. Although this might have been resolved on cross-examination, defense counsel chose not to cross-examine Rochowicz or challenge his credibility. In any event, the State freely acknowledged that Dorsey tested positive for GSR while defendant did not. That one explanation of the GSR results was that some GSR was removed during defendant and Dorsey's flight from the police was clearly based on the Rochowicz testimony that removal was possible from the defendant's uncontested behavior after abandoning the crashed Grand Prix. Because the

State's comments were based on the evidence and reasonable inferences therefrom, we find no error.

¶ 57   Defendant's contention that the State "exacerbated" its improper remarks on the GSR results is similarly without merit. Defendant argues that the State compounded its error by characterizing defendant's results as "inconclusive" and comparing it to rapid COVID-19 tests. However, these comments were made in the context of an argument that the lack of positive GSR result does not definitively prove that a person did not discharge a firearm for a variety of reasons. Again, this was based on Rochowicz's testimony and therefore a proper subject for closing argument.

¶ 58   Second, defendant maintains that the State argued facts not in evidence when, in rebuttal, it suggested that the shooting in this case were motivated by revenge for the murder of defendant and Dorsey's mutual cousin, which occurred earlier that month. We agree with defendant that there was little evidence in the record to suggest that the shooting was motivated by revenge. For example, the State did not connect the victims to the cousin's murder, nor was there anything to suggest that defendant suspected that the victims were involved in the cousin's murder. That said, the State's comments on this topic primarily involved the assertion that defendant and Dorsey committed the murders after leaving a "party commemorating the death of [their] deceased cousin." Although defendant maintains that this mischaracterized the evidence, our review of the record shows that defendant's testimony was somewhat ambiguous on this point. Defendant acknowledged that Dorsey was in town for the cousin's funeral, but stated that the pre-shooting gathering was "[n]ot technically" focused on his late cousin. However, defendant was unable to clearly explain what he meant by this. Based on this ambiguous record, it is a fair inference and

within the wide latitude afforded in closing argument for the State to suggest that defendant's cousin might have been on his mind at the time of the shooting.

¶ 59    Regardless, we cannot say that this relatively minor aspect of the State's overall closing argument and rebuttal created substantial prejudice. In coming to this determination, we are mindful that we must assess the danger of prejudice by viewing the closing argument as a whole rather than focusing on selected remarks. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). We also note that the trial court instructed the jury that closing arguments are not evidence, which serves to greatly diminish the prejudicial impact of improper remarks during closing arguments. *People v. Boston*, 2018 IL App (1st), 2018 IL App (1st) 140369, ¶ 103. Accordingly, we find that the State's comments regarding a possible motive for the shooting do not require reversal.

¶ 60    Third, defendant contends that the prosecution improperly shifted the burden of proof onto the defense when it stated in rebuttal that the defense could have subpoenaed Curry to testify. We disagree. Our review of the record shows that the State's single comment was merely a response to the defense repeatedly mentioning Curry and implying that the State did not call her to testify because it was bad for the State's case. It is not improper for the State to respond to the defense's comments that clearly invite a response. *Moody*, 2016 IL App (1st) 130071, ¶ 60. Importantly, at no point did the State suggest that the defense was *required* to subpoena Curry and present her testimony at trial. See *People v. Willis*, 2013 IL App (1st) 110233, ¶112. Rather, the State merely informed the jury that the "[i]f the Defense wanted to, they *could have* subpoenaed Quanda Curry as well." (Emphasis added.). Additionally, both the State and the trial court repeatedly reminded the jury that the State bears the burden of proof. Illinois courts have routinely held it is not improper for the State to comment on the defense's subpoena power under similar circumstances. See, *e.g.*, *People v. Williams*, 2022 IL 126918, ¶ 45; *People v. Kliner*, 185 Ill. 2d 81, 154-55 (1998); *People*

*v. Suggs*, 2022 IL App (2d) 200713, ¶¶ 42-45; *Willis*, 2013 IL App (1st) 110233, ¶ 112; *People v. Baugh*, 358 Ill. App. 3d 718, 741-42 (2005). Accordingly, we find no error here.

¶ 61                              D. Cumulative Error

¶ 62    As a final matter, we note that defendant also contends that the combined prejudicial effects of the various alleged errors amount to cumulative error. Where there are errors not individually considered sufficiently egregious to warrant reversal of a conviction, a new trial may nevertheless be granted based on cumulative error if multiple errors create a pervasive pattern of unfair prejudice to a defendant's case. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). However, such a result is warranted only where the cumulative errors themselves are extreme. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 110. Moreover, there is generally no cumulative error where the alleged errors do not justify reversal on any individual issue. *Green*, 2017 IL App (1st) 152513, ¶ 118. Having rejected defendant's arguments that multiple errors occurred his trial, we likewise reject his claim of cumulative error.

¶ 63                              III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court.

¶ 65    Affirmed.