2025 IL App (1st) 230035-U

No. 1-23-0035

First Division
November 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | No. 17 CR 11231 |
| v. | ) ) | |
| JAYTON DORSEY, | ) ) | Honorable Timothy J. Joyce |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction and sentence for first-degree murder is affirmed. The trial court did not err by acting impartially, admitting firearm identification evidence without a *Frye* hearing, or denying defendant's request for a continuance. Additionally, the State did not make improper comments during cross-examination or closing argument, and defendant's sentence did not violate the proportionate penalties clause of the Illinois Constitution.

¶ 2    Following separate but simultaneous jury trials, defendant Jayton Dorsey and his cousin, codefendant Timothy Gordon, were each convicted on three counts of first-degree murder and

sentenced to mandatory terms of life in prison.[1] Defendant now appeals, arguing that (1) the trial court erred in denying his motion for a *Frye* hearing on firearm identification evidence, (2) the trial court acted as an impartial advocate for the State, (3) the State made several improper remarks during cross-examination and closing argument, (4) the trial court erred in denying his posttrial request for a continuance, and (5) his life sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     The charges in this case arose from the June 30, 2017, shooting deaths of Javon Jackson, Sedrick Ringer, and John Hunter. The evidence showed that the victims were killed by a barrage of gunfire while standing outside a building in the 5700 block of South Wells Street in Chicago.

¶ 5                 A. Motion to Exclude Firearm Identification Evidence

¶ 6     Prior to trial, defendant filed an extensive, 75-page motion in *limine* seeking to exclude the testimony of forensic firearms examiner Jennifer Sher. The motion cited reports from various scientific bodies casting doubt on the efficacy of firearm identification, the practice of microscopically examining fired ammunition to determine whether it was fired from a particular gun. Defendant also asserted that firearm examiners were prone to false positives for a variety of reasons such as cognitive bias. For these reasons, defendant argued that firearm identification "cannot be said to enjoy wide-spread scientific acceptance, nor to possess reliability sufficient to overcome the prejudicial and overblown statements of its practitioners." Although defendant acknowledged that Illinois courts have long admitted firearm identification evidence, he contended that the field could no longer withstand scrutiny in light of the recent evidence cited in his motion.

---

[1] This court affirmed Gordon's convictions and sentence in a separate appeal. *People v. Gordon*, 2025 IL App (1st) 230037-U. He is not a party to this appeal.

Defendant therefore requested that the trial court either exclude any testimony regarding firearm identification or conduct a pretrial hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to assess the general acceptance and reliability of the firearms evidence.

¶ 7       In response, the State argued that a *Frye* hearing was unnecessary because the methodologies in question were not new or novel and have been routinely admitted by Illinois courts. The State also cited *People v. Robinson*, 2013 IL App (1st) 102476, ¶ 91, where this court considered many of the criticisms raised in defendant's motion and concluded that the trial court in that case did not err in admitting expert testimony on firearm identification without first holding a *Frye* hearing.

¶ 8       After hearing arguments from the parties, the trial court denied defendant's motion. The court stated the firearms evidence would be admitted without a *Frye* hearing because the examinations were "of a type that is generally accepted in the field to which it belongs."

¶ 9                                    B. Jury Trial

¶ 10      At trial, Michael Graves testified that he heard the gunshots from his home on South Wells just before 9 p.m. on June 30, 2017. As he approached the window to check on the noise, Graves noticed "a couple of muzzle flashes" and "maybe two people" shooting firearms. However, the shooters quickly fled and Graves did not see their faces. Graves was able to describe the shooters only as "African-American males."

¶ 11      Detective Mark Campbell testified that he and his partner, Officer Krista Hinton, were on patrol near South Wells at the time of the shooting. When they heard the gunshots, the officers immediately activated their emergency equipment and drove toward the source of the noise. As they approached South Wells, Detective Campbell saw "two or three males" firing guns at a residence from the sidewalk.

¶ 12    The shooters then ran south toward 58th Street, which was the next block over. As the officers pursued in their vehicle, they noticed a white Pontiac parked on 58th Street. Detective Campbell testified that two men inside the Pontiac "looked like" the people he had just seen shooting firearms.

¶ 13    The Pontiac then drove off and entered the Dan Ryan Expressway "at a high rate of speed." The officers followed the Pontiac down the expressway as it "weav[ed] in different lanes" to avoid slower traffic. Eventually, the Pontiac spun out of control and crashed onto a grassy hill on the side of the expressway. As Detective Campbell exited his vehicle and approached the crash site, he saw two people from the Pontiac run up the hill and climb a barbed wire fence surrounding an IDOT parking lot.

¶ 14    Detective Campbell and Officer Hinton secured the area around the crashed Pontiac and waited for backup to arrive. During that time, Detective Campbell observed a handgun in plain view in the backseat of the Pontiac. The State introduced into evidence video footage from the officers' squad car, which substantially corroborates Detective Campbell's testimony.[2] With the help of a police helicopter, defendant and Gordon were subsequently found and arrested while attempting to hide on the back deck of a residence on 66th Street. Footage from the helicopter and the arresting officers' body-worn cameras were also introduced into evidence.

¶ 15    Shortly after the arrests, at approximately 9:44 p.m., Detective Joseph Murtaugh administered gunshot residue (GSR) collection kits for defendant and Gordon. These kits were

---

[2] The video footage was not included in the record on appeal in this case, but was made part of the record on appeal in codefendant Gordon's case. We take judicial notice of the video exhibits. *In re Marcus S.*, 2022 IL App (3d) 170014, ¶ 46 n.4 (appellate court may *sua sponte* take judicial notice of public documents contained in the record of any other judicial proceeding if doing so would be helpful in deciding the case before us).

later analyzed by forensic scientist Scott Rochowicz, who testified for the State as an expert in GSR testing. Rochowicz determined that defendant's right hand showed "a minimum of three of the tricomponent particles and additional consistent particles," leading Rochowicz to conclude that defendant had likely discharged a firearm or been in close proximity to the discharge of a firearm. However, Rochowicz testified that defendant's left hand and both of Gordon's hands tested negative for GSR. Rochowicz acknowledged that GSR could be removed from a person's hands by a variety of activities, including running, climbing a fence, and touching other objects.

¶ 16    The firearms evidence collected in this case consisted of a .45-caliber handgun recovered from the backseat of the crashed Pontiac and a .40-caliber handgun recovered from the IDOT parking lot through which defendant and Gordon fled after the crash. Police also recovered numerous .40-caliber, .45-caliber, and 9-millimeter fired cartridge cases from the murder scene.

¶ 17    Per the trial court's pretrial ruling, Sher testified that she investigated this evidence for the Illinois State Police as an expert in the field of firearm identification. After comparing the fired cartridge cases to test shots from the recovered firearms, Sher determined that all .40-caliber cartridge cases found at the scene were fired from the gun recovered in the IDOT parking lot, and that all .45-caliber cartridge cases found at the scene were fired from the gun recovered from the Pontiac. Sher also determined that all of the 9-millimeter cartridge cases from the scene were fired by the same weapon; however no 9-millimeter firearm was ever recovered in this case. Defendant's counsel chose not to question Sher on cross-examination.

¶ 18    Forensic scientist Cynthia Prus testified that she examined various latent fingerprint samples collected in this case, including those on the firearm recovered from the IDOT parking lot. After comparing a print from the firearm to a known sample from defendant, Prus concluded that the firearm print was made by defendant's right ring finger.

¶ 19    Forensic scientist Dr. Yongfei Wu testified that he created DNA profiles from samples provided by defendant and Gordon. He then compared these profiles to various unknown DNA samples from evidence collected in this case. In particular, Dr. Wu analyzed DNA swabs from the recovered firearms, which he combined because each had a "very low amount of DNA" on its own. Dr. Wu explained that the swabs showed a "mixture" of DNA from at least four people. Even with the help of sophisticated computer programs, this mixture was too complex to identify any individuals who may have contributed their DNA. Dr. Wu further testified that Gordon's DNA was found on a T-shirt hanging from the barbed wire fence surrounding the IDOT parking lot.

¶ 20    On cross-examination, Dr. Wu confirmed that he did not determine that defendant's DNA was present on any of the evidence he tested. Nevertheless, defense counsel proceeded to question Dr. Wu about whether defendant could be definitively excluded as contributing to the mixture from the gun swabs. In response to this questioning, Dr. Wu acknowledged that he identified alleles at 19 of the possible 23 chromosomal locations in the mixture, but reiterated that he was unable to include or exclude anyone based on his results. The following exchange then occurred:

> "Q. It's true also, Dr. Wu, that for those 19 locations, specifically for [the gun swabs] there are often alleles present that cannot have come from Mr. Dorsey present [sic] that are not in his DNA?
>
> THE COURT: Well, that's necessarily true in a mixture?
>
> [DEFENSE COUNSEL]: Yes, Judge, that is true.
>
> THE COURT: Let's take a recess. Take the jury out, bring them in the hallway if you would."

¶ 21    Once the jury was excused, the court asked defense counsel what he was looking to establish with these questions. Defense counsel objected, arguing that it would be inappropriate to

discuss the matter in the presence of Dr. Wu. The court disagreed, stating "No, let's go. Come on." Defense counsel then explained that he sought to establish that "at a multitude of these genetic locations [Dr. Wu] tested, even though DNA results were obtained Mr. Dorsey's alleles are not present at those locations in these mixtures." After a lengthy discussion, the court allowed defense counsel to continue his line of questioning, but cautioned that the defense would not be allowed to mislead the jury by contending that defendant was excluded from the mixture at closing arguments.

¶ 22    When cross-examination resumed, Dr. Wu explained that the absence of defendant's alleles at a particular location does not necessarily exclude him as a contributor for several reasons. For example, Dr. Wu explained that a person's DNA can be "dropped out and not detected" at a location if it is at a "low level." However, Dr. Wu agreed that another explanation for the absence of defendant's alleles at a particular location is that he was not a contributor.

¶ 23    On re-direct examination, Dr. Wu testified that it would not be generally accepted in the field of DNA analysis to exclude an individual as a contributor to a mixture based on the absence of his alleles at some location. Dr. Wu reiterated that the mixture from the gun swabs was too complex to include or exclude any person as a contributor.

¶ 24    The defense's case-in-chief consisted solely of defendant's testimony. Defendant testified that he was in Chicago in June 2017 because he was staying at his aunt's house while on summer break from college. On the night of the shooting, defendant attended a family gathering at the aunt's house in honor of his late cousin, who had been shot and killed approximately three weeks prior. At the gathering, defendant's cousin Marquise Banks pulled him aside and showed him a gun. Because defendant did not have any experience with firearms, Banks showed him how to work the safety and remove the clip. Defendant briefly touched the gun to practice what Banks had shown him. Defendant then handed the gun back to Banks and they rejoined the party.

¶ 25 Several hours later, Gordon, Banks, and Cameron Slater (a friend of Banks' who defendant knew only as "Cam") told defendant that they wanted to go buy marijuana. Defendant drove them in the Pontiac because he was the only one with a valid drivers' license. He did not know who owned the vehicle.

¶ 26 Defendant drove to 58th Street and parked on the side of the street. Gordon, Banks, and Slater exited the vehicle while defendant stayed behind in the driver's seat. As defendant waited for them to return, he heard a "few loud bangs." The noises then became more rapid and "sounded extremely close." Defendant was afraid and crouched down in his seat for cover.

¶ 27 Moments later, Gordon, Banks, and Slater returned to the car in a panic and yelled for him to drive away. Defendant did not know what was going on but sped off onto the expressway as instructed. Defendant knew the police were pursuing them, but he was "too afraid to stop." Defendant soon lost control of the car and crashed on the side of the expressway.

¶ 28 Defendant, Gordon, Banks, and Slater all exited the car and ran. Banks and Slater ran in one direction while defendant and Gordon ran in the other. Defendant and Gordon hopped the embankment on the expressway and climbed a fence into an IDOT parking lot. They then ran through the parking lot and into a neighborhood, where they were arrested while attempting to hide on the porch of a residence.

¶ 29 Defendant testified that he never saw Gordon, Banks, or Slater with a gun after they left the family gathering. Defendant denied firing a gun on the day of the murders. He did not know that the others were planning on committing a shooting.

¶ 30                                    C. Motion Regarding Defendant's Motive

¶ 31 Upon the close of evidence, defendant filed a motion to prevent the State from suggesting during its closing argument that the shooting was motivated by revenge for his recently-murdered

cousin. Defendant contended that such an argument would require the State to rely on assumptions not based on the evidence because "[n]ot a scintilla of evidence" connected the victims with the murder of defendant's cousin. Defendant further maintained that the argument would also "impermissibly inject the specter of gang violence" into the trial because "most people associate retaliatory shootings with gang activity."

¶ 32    After hearing arguments from the parties, the trial court denied defendant's motion. In so ruling, the court stated that defendant's testimony "suggests the possible motive by his own cousins" Banks and Gordon because they had been at a gathering to commemorate the death of their mutual cousin immediately prior to the shooting.

¶ 33                                    D. Closing Arguments

¶ 34    At closing arguments, the State argued that defendant, Gordon, and an unknown third gunman planned to commit the shooting and positioned their Pontiac to make a quick escape onto the expressway. Unfortunately for them, they were "caught essentially red-handed" because officers happened to be nearby. The State emphasized that the fingerprint, GSR, and firearms evidence showed that defendant handled one of the murder weapons and fired at the victims more than a dozen times. The State also contended that defendant's innocent explanations for this forensic evidence were "fanciful" and "ridiculous."

¶ 35    The defense's theory at closing argument was that Gordon, Banks, and Slater were the shooters while defendant was "tricked *** into being a getaway driver" under the pretense of buying marijuana. Defense counsel contended that the GSR could have been transferred to defendant from one of the shooters or arresting officers. Similarly, the presence of defendant's fingerprint on the .40-caliber firearm was explained by his testimony that he touched it when Banks showed it to him at the family gathering. The defense also emphasized that defendant's DNA was

not found on either recovered firearm despite allegedly shooting one of them many times. Finally, defense counsel argued that defendant would not derail his life for a "motiveless shooting," noting that "there hasn't even been an allegation of how he has any connection to any of [the victims] or why there would be a retaliatory strike" for his cousin's recent murder.

¶ 36 In rebuttal, the State contended that defendant and Gordon committed the murders in a "targeted hit" as revenge for the recent murder of their mutual cousin. The State maintained that the forensic and circumstantial evidence established that defendant was one of the shooters beyond a reasonable doubt. The State further asserted that defendant was a "horrible liar" whose testimony "complete defies logic" in various ways.

¶ 37                                  D. Posttrial Motions

¶ 38 On July 18, 2022, the jury found defendant guilty of first-degree murder with respect to all three victims. The matter was then continued to September 9, 2022, for argument on posttrial motions. On that date, defendant was not present in court because, according to the sheriff, he "refused to come to court."

¶ 39 On November 10, 2022, the matter was continued again because the parties had not yet filed their posttrial motions. The case was then set for arguments on posttrial motions on December 14, 2022. On that date, defense counsel informed the court that he was ready to proceed with posttrial motions, but that defendant wished to address the court. The following exchange then occurred:

> "DEFENDANT DORSEY: I wanted to ask you if I was to ask my attorney to withdraw
> from the case, would I have to proceed with my retrial motion today?
>
> THE COURT: You want your attorney to withdraw from the case?
>
> DEFENDANT DORSEY: Yes.

THE COURT: When I say your attorney, I mean Mr. Schleyer and Mr. Gutierrez—

DEFENDANT DORSEY: Yes."

Defendant then explained that he and his mother had "been in contact with several lawyers" and were in the process of deciding which one to hire. Defendant continued that it had taken him "a while" to find new counsel because he "had trouble getting in contact" with many of the candidates and working out a financial arrangement. The court ultimately denied defendant's request for a continuance, noting that it had been nearly four and a half years since the shooting and over five months since the verdicts were read. The court opined that defendant therefore had "ample time to have secured counsel" but had not so. The court noted that it had asked defendant "several very open-ended questions" regarding his request for a continuance and that he had not offered "any particular reason" why he wanted to obtain replacement counsel.

¶ 40    The court then heard arguments on the motion written by defendant's trial counsel. That motion raised numerous claims, including that (1) the State failed to prove the charges beyond a reasonable doubt; (2) the court erred in denying several of defendant's pretrial motions, including those to limit or exclude testimony regarding firearm and fingerprint identification; (3) the court erred in allowing hearsay statements; (4) the court erred by interjecting its own opinion during Dr. Wu's cross-examination; (5) the court erred in allowing the State to ask defendant improper questions on cross-examination; and (6) the court erred in allowing the State to argue that the shooting was motivated by revenge for defendant's recently-murdered cousin. Defendant's motion was denied.

¶ 41                         E. Sentencing Hearing

¶ 42    After the denial of defendant's posttrial motion, the matter proceeded to a sentencing hearing. The State argued that the only sentence allowed under the law was a natural life sentence,

which the State maintained was appropriate in light of the nature of the offense and the "utter disregard for human life" exhibited by defendant. The court also reviewed a "fairly lengthy" packet of mitigating evidence submitted by the defense, as well as defendant's Presentence Investigation Report (PSI). The mitigation packet and PSI revealed that defendant was primarily raised without a father in "less fortunate" economic circumstances.. Despite these challenges, defendant became a star football player who set numerous high school records for Dunbar Vocational Career Academy. After graduating from Dunbar, defendant played at Dodge City Community College in Kansas, where he also received an academic scholarship and worked as a resident assistant. The mitigation packet contains several letters from defendant's teammates attesting to his high moral character.

¶ 43    In argument, defense counsel acknowledged that a life sentence was required by statute, but contended that such a sentence was "cruel and unusual" because it did not consider defendant's age, education, background, and potential for rehabilitation. Invoking the United States Supreme Court's decision in *Miller v. Alabama*, 567 US 460 (2012), counsel further asserted that the court should consider that "youthful offenders have different brain activity" that impacts their ability to regulate their behavior and appreciate the consequences of their actions. Defendant did not make a statement in allocution.

¶ 44    The court sentenced defendant to life in prison, which the court found was statutorily required because defendant was over the age of 18 and convicted of multiple murders. The court noted the defense's invocation of *Miller*, but opined that concerns about youthful offenders did not apply to this case because defendant was "obviously well educated" and did not have "minimal involvement" in the shooting. The court further stated that the sentence "pass[es] Constitutional

muster" as applied to defendant given the "brazen" and "horrific" nature of the offense. Defendant's motion to reconsider his sentence was denied.

¶ 45    This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47                           A. Motion for *Frye* Hearing

¶ 48    On appeal, defendant first argues that the trial court erred in denying his motion to either exclude the State's firearm identification evidence and or hold a *Frye* hearing to determine the admissibility of that evidence. As he did below, defendant contends that firearm identification evidence is inadmissible because it is not generally accepted in the scientific community. For support, defendant relies primarily on a 2009 report from the National Academy of Sciences that concluded the field of firearms lacks objective standards and has not been subjected to rigorous scientific scrutiny or research.

¶ 49    In Illinois, the admission of expert testimony is governed by the standard first articulated in *Frye*, 293 F. 1013 (D.C. Cir. 1923). *In re Detention of New*, 2014 IL 116306, ¶ 25. Under *Frye*, scientific evidence is admissible at trial only if it is based on a methodology or principle that is generally accepted in the relevant scientific field. *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004). To qualify as "generally accepted," the methodology or principle in question need not have gained universal acceptance or even be accepted by a majority of experts in the relevant field. *Id.* Instead, it is sufficient that the methodology underlying the expert witness's opinion is reasonably relied upon by experts in the field. *Id.* at 530. Additionally, the *Frye* standard applies only to scientific methodologies that are "new" or "novel." *Id.* A scientific methodology is considered "new" or "novel" in this context if it is original or does not resemble something formerly known or used. *Id.* A trial court may decide that a scientific methodology or principle is

generally accepted by either (1) holding an evidentiary hearing or (2) taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. *People v. McKown*, 226 Ill. 2d 245, 254 (2007). Whether a scientific methodology is "generally accepted" within the meaning of the *Frye* standard is reviewed *de novo*. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 50    Initially, we note that the State contends that the firearm identification evidence relevant to this case is neither "new" nor "novel" within the meaning of *Frye* because Illinois courts have allowed such evidence since at least our supreme court's 1930 decision in *People v. Fisher*, 340 Ill. 216, 240-41 (1930). Defendant acknowledges that Illinois courts have routinely allowed firearm identification evidence for many years, but insists that the methodology is still novel because, as *Frye* hearings are rarely held on firearm identification evidence, newer research "has not been adequately litigated" in Illinois.

¶ 51    We find *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 54, instructive. There, as here, the defendant relied primarily on the 2009 report from the National Academy of Sciences and our supreme court's decision in *People v. McKown*, 226 Ill. 2d 245 (2007), in arguing that the trial court erred by admitting firearm identification evidence without holding a *Frye* hearing. *Id.* We disagreed, stating that "[t]oolmark and firearm identification evidence is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*." *Id.* ¶ 61We continued that, "[f]ar from being unsettled, the law in Illinois is consistent in its admission of such evidence." Id.

¶ 52    We distinguished firearm identification evidence from the horizontal gaze nystagmus test relevant in *McKown*, noting that the admissibly of the former was well-settled whereas the latter had never been accepted after a *Frye* hearing in an Illinois court. *Id.* ¶ 58. We also rejected the

defendant's reliance on the National Academy of Sciences report, holding that "the report's concerns go to the weight and not to the admissibility of such evidence." *Id.* ¶ 62. Accordingly, we affirmed the admission of firearm identification evidence without the need for a *Frye* hearing. *Id.* ¶ 62; see also *Robinson*, 2013 IL App (1st) 102476, ¶ 91 (same).

¶ 53    In this case, defendant does not address *Rodriguez* other than summarily asserting it was erroneously decided based on "unsubstantiated science from a different time." However, *Rodriguez* remains good law and we see no reason to depart from it. We also note that much of the research cited by defendant, particularly the 2009 National Academy of Sciences report predates *Rodriguez* and was considered by that court.

¶ 54    In any event, even if we were to find that the firearm identification evidence should not have been admitted, the error would have been harmless. Even where evidence is erroneously admitted, this court may affirm a conviction if the error was harmless beyond a reasonable doubt. *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 31. Evidentiary error is harmless where there is no reasonable probability that the defendant would have been acquitted but for the error. *People v. Sheppard*, 2021 IL App (1st) 181613, ¶ 23.

¶ 55    Here, any evidentiary error would have been harmless because the evidence against defendant was overwhelming. Even without the challenged firearm identification evidence, the trial evidence still established that defendant was present at the crime scene with the shooters and led the police on a high-speed chase in an attempt to escape. Defendant continued to flee on foot after crashing his vehicle, bloodying his hands by climbing a barbed wire fence in the process. Defendant's hand also tested positive for GSR shortly after his arrest, and it is undisputed that his fingerprint was found on the .40-caliber firearm recovered from the path of his flight from police. The caliber of that firearm matched many of the spent cartridge cases found at the crime scene.

Considering this substantial evidence, further evidence connecting the .40-caliber firearm to the cartridge cases left at the scene was little more than cumulative.

¶ 56     To be sure, defendant contends that the error was not harmless because "the State presented no evidence refuting his testimony," which he maintains explains the forensic evidence against him. However, defendant's testimony does not render any evidentiary error prejudicial. We agree with the trial court that defendant's self-serving testimony was somewhat "fantastical," and thus have no reason to believe the jury would have accepted it but for the claimed evidentiary error. See also *Gordon*, 2025 IL App (1st) 230037-U, ¶ 35 (opining that similar testimony from Gordon "strains credulity"). Consequently, any error in the admission of the firearm identification evidence would have been harmless.

¶ 57                    B. Dr. Wu's Cross-Examination

¶ 58     Defendant next argues that he was denied his right to a fair trial when the trial court "abandoned its role as a neutral arbiter and showed bias toward the defense" during the cross-examination of Dr. Wu. In particular, defendant challenges the following instance where the court interjected while defense counsel was cross-examining Dr. Wu about whether defendant could be excluded as a contributor to the DNA mixture from the recovered firearms:

"Q. It's true also, Dr. Wu, that for those 19 locations, specifically for both [firearm swabs] there are often alleles present that cannot have come from Mr. Dorsey present [sic] that are not in his DNA?

THE COURT: Well, that's necessarily true in a mixture?

[DEFENSE COUNSEL]: Yes, Judge, that is true.

THE COURT: Let's take a recess. Take the jury out, bring them in the hallway if you would."

The court then held a sidebar during which, over defense counsel's objection, Dr. Wu remained present on the witness stand outside the presence of the jury.

¶ 59 Of course, every criminal defendant has a right to a fair trial before a neutral judge. However, a trial court has wide discretion to control the course of the trial, including the right to raise its own objections and question witnesses. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115. A court must exercise extreme caution to avoid influencing the jury by stating or implying its opinion on the credibility of a witness or the argument of one of the parties. *People v. Tatum*, 389 Ill. App. 3d 656, 662 (2009). That said, a trial judge does not become an advocate for the State merely because his questions solicit evidence beneficial to the prosecution. *People v. Harris*, 384 Ill. App. 3d 551, 561 (2008). Even where a trial judge acted improperly, a new trial is warranted only if the defendant was prejudiced by the court's conduct. *Moore*, 2023 IL App (1st) 211421, ¶ 115.

¶ 60 Here, defendant contends that the trial judge interjected his own opinion on the evidence by stating that it was "necessarily true in a [DNA] mixture" that not every allele was contributed by the same person. Defendant also maintains that the court continued "acting as an advocate for the State" by forcing defense counsel to discuss his theory of the case in the presence of Dr. Wu during the side bar.

¶ 61 We find no reversible error here. First, we fail to see how the "necessarily true" comment prejudiced defendant, as the court *agreed* with the premise of defense counsel's question. That is why defense counsel answered the court's question by stating, "Yes, Judge, that is true." Additionally, the sidebar occurred outside the presence of the jury, so any comments from the court could not have influenced it. Although defendant maintains that Dr. Wu should not have been allowed to hear the reason for defense counsel's line of questioning, the defense's theory was

rather obvious. And, even after the sidebar, Dr. Wu essentially reiterated what he said on direct examination: the guns swabs were too complex to identify who may have contributed to them. There is little chance that Dr. Wu would have testified that defendant was excluded as a contributor had he not been present for the sidebar. Instead, it is highly likely that the State would have elicited that defendant could not be excluded during redirect examination anyway.

¶ 62    Regardless, this line of questioning was of minor importance to the overall trial. At best, defense counsel's questioning could have established that defendant's DNA was not found on the recovered firearms. However, the jury would still have heard that defendant's fingerprint was found on the gun recovered in the IDOT parking lot. Indeed, defendant himself admitted to handling the gun at his aunt's house just before the shooting. Thus, there is no reasonable possibility that the trial court's conduct prejudiced defendant, and therefore no reversible error.

¶ 63                    C. Prosecutorial Misconduct

¶ 64    Defendant next contends that the State committed "prosecutorial misconduct" through various statements made in cross-examination and closing argument. Generally, the State is afforded wide latitude in opening statements, closing arguments, and cross-examinations. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21. However, it remains improper for a prosecutor to make statements that have no purpose other than to inflame the passions of the jury. *Id.* It is also improper for the prosecution to misstate the evidence or argue facts that were not in the evidence. *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 84. On the other hand, the State may assume the truth of its evidence and comment on any reasonable inferences drawn therefrom. *Id.* In evaluating allegedly improper remarks for the State, the comments must be viewed in their entirety and in context of the closing argument as a whole. *Id.* Statements are generally not improper where they were provoked or invited by the defense. *Id.* Additionally, even improper comments do not warrant

reversal unless they "engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them." *McNeal*, 2019 IL App (1st) 180015, ¶ 43.

¶ 65    This court has previously noted the "confusion" surrounding the appropriate standard of review when a defendant alleges that the State made improper remarks during closing argument. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39. This confusion stems from two supreme court cases: (1) *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), where our supreme court held that whether a prosecutor's comments were egregious enough to require a new trial is a question of law reviewed *de novo*, and (2) *People v. Blue*, 189 Ill. 2d 99, 244 (2000), where our supreme court reviewed the propriety of a prosecutor's remarks during closing arguments under the abuse of discretion standard. Here, the parties agree that the proper standard is whether the trial court abused its discretion in allowing the State to make the challenged remarks. Regardless, we observe that we would reach the same conclusion under either standard. See *People v. Stewart*, 2013 IL App (1st) 210912, ¶ 77 (appellate court need not resolve dispute over standard of review where it determines that the challenged comments were proper under any standard).

¶ 66    A review of the record shows that the challenged remarks are rather isolated and involve only minor trial issues. Thus, there is no reasonable probability that these comments affected the outcome of defendant's trial.

¶ 67                                    1. "Facts Not in Evidence"

¶ 68    For example, defendant contends that the State improperly argued facts not in evidence when, on four occasions during its cross-examination of defendant, it implied that he was driving either 100 or 110 miles per hour before crashing the Pontiac. Defendant observes that he testified only that he drove faster than 55 miles per hour. Similarly, Detective Campbell testified only that

defendant was traveling "at a high rate or speed" and "faster than the flow of traffic" on the expressway. Thus, defendant concludes that it was improper to suggest that he drove 100 miles per hour where there was no evidence of his precise speed.

¶ 69    However, we have no doubt that the verdict did not hinge on the jury's belief that defendant drove 100 miles per hour rather than some lesser speed. In any event, the jury observed the video from Detective Campbell's dashboard camera which confirms that defendant drove extremely quickly and recklessly for about 30 seconds before losing control and crashing his vehicle. We also note that the State's closing argument did not mention a specific speed, but rather told the jurors that they "saw that video" and "can make a determination of how fast [defendant]'s going" for themselves.

¶ 70                                   2. "Misstatement" of Testimony

¶ 71    Similarly, defendant argues that the prosecution "misstated" his testimony by implying that he was present at the crime scene during the following exchange:

> "Q. Mr. Dorsey, just before I ask you about what happened, I just want to clarify a couple
> things. So, according to you, you were just present when this shooting occurred; right?
> A. Yes.
> [DEFENSE COUNSEL]: Objection.
> THE COURT: Overruled."

Defendant maintains that this was error because his testimony was that he was sitting in the Pontiac half a block away rather than at the scene of the shooting.

¶ 72    First, we fail to see how defendant can claim that the prosecutor misstated his testimony when he answered the question in the affirmative, meaning he agreed that he was "just present"

when the shooting occurred. Additionally, it was reasonable for the State to describe defendant as "present" when, by his own account, he was no more than half a block from the shooting and reunited with the shooters just moments later. Indeed, defendant testified that the gunfire was so close to him that he crouched down in his seat for fear of getting shot. Thus, his argument is meritless.

¶ 73                    3. Questions Outside Defendant's Knowledge

¶ 74    Defendant further argues that, elsewhere during cross-examination, the State improperly asked two questions that were outside the scope of his knowledge. First, defendant takes issue with the State asking him whether the IDOT parking lot was "where that gun that has your fingerprints on [it] was recovered." Second, defendant challenges the State asking him whether, as the only licensed driver in the group, he was asked to drive the others to the shooting because it was "important for [Banks] to follow the rules of the road."

¶ 75    As with the question about his presence at the crime scene, we note that defendant answered, "Yes" to the question of whether the gun with his fingerprint was the one recovered in the IDOT parking lot. Thus, defendant cannot seriously claim that the question was outside of his personal knowledge.

¶ 76    As for the question regarding Banks' desire to "follow the rules of the road," defendant simply answered that he "had no idea what [Banks'] thought process was," and the State moved on to a different line of questioning. Clearly, this single question on an unimportant issue did not affect the verdict. Reversal is therefore not required.

¶ 77                    4. "Taunting" and "Sarcastic" Remarks

¶ 78    Next, defendant alleges that the prosecutors made generally "taunting" and "sarcastic" remarks that were unrelated to the evidence and designed solely to "harass and demean" him in

order to undermine his credibility. In particular, defendant likens his case to *People v. Schaffer*, 2014 IL App (1st) 113493, ¶ 51, where this court reversed a defendant's conviction based on improper questions that "were designed to ridicule and demean [the] defendant." However, that case is readily distinguishable.

¶ 79     In *Schaffer*, the defendant was charged with aggravated criminal sexual assault. *Id.* ¶ 1. There was no dispute that the defendant and the victim engaged in sexual activity; the only issue was whether it was consensual. *Id.* ¶ 2. On cross-examination, the State repeatedly asked the defendant whether the victim and investigating detectives fabricated their testimony against him. *Id.* ¶ 51. We first found that this questioning was error, as it is improper for the State to ask a defendant his opinion on the veracity of other witnesses. *Id*. ¶ 49. Second, we found that this error warranted reversal because the evidence was closely balanced in a classic " 'he said/she said' scenario" where both the defendant and the victim had "some problems with credibility." *Id.* ¶ 52.

¶ 80     In contrast to *Shaffer*, the State in the present case did not ask defendant to opine on the veracity of other witnesses. Nor did the State ask questions solely designed to demean defendant. For instance, defendant objects to the State asking him whether Banks "magically appear[ed]" at his aunt's house before the shooting. Although defendant asserts that this question "had no real purpose" other than to harass him, the record shows that the State's strategy was to establish that Banks drove himself a significant distance to attend the family gathering. And defendant did admit that Banks drove the Pontiac to the gathering, thus undermining his testimony that his cousins needed him to drive to the shooting because he was the only one with a valid driver's license. While the wording of this and other questions was perhaps mildly sarcastic, we agree with the State's characterization that its cross-examination was "vigorous" without crossing the line into embarrassing or demeaning defendant.

¶ 81 Furthermore, this case also differs from *Shaffer* in that the evidence was not closely balanced. Rather than a case of "he said/ she said," defendant's involvement in the shooting was proved by ample physical and forensic evidence as detailed above. Reversal is not warranted in the face of this overwhelming evidence.

¶ 82                                              5. Motive

¶ 83 Finally, defendant argues that the trial court erred by allowing the State to argue that the shootings were motivated by revenge for the recent murder of defendant and Gordon's mutual cousin. Defendant contends that this argument was improper where there was no evidence connecting the victims to the cousin's murder or suggesting that defendant believed the victims to be responsible.

¶ 84 Initially, we note that we affirmed Gordon's convictions over a similar argument on direct appeal. *Gordon*, 2025 IL App (1st) 230037-U ¶¶ 58-59. There, Gordon contended that the State argued facts not in evidence during closing argument by stating that he and defendant were at a "party commemorating the death of [their] deceased cousin" before the shooting. *Id.* ¶ 58. We disagreed, finding that it was a "fair inference and within the wide latitude afforded in closing argument" based on Gordon's "ambiguous" testimony on whether the party was connected to the cousin's death. *Id.* Regardless, we stated that this "relatively minor" aspect of the State's overall closing argument did not create substantial prejudice, especially where the trial court properly instructed the jury that closing arguments are not evidence. *Id.* ¶ 59.

¶ 85 Defendant's argument in this case is even weaker than the one we rejected in *Gordon*. Here, defendant testified that "it was a family gathering for the –[his] cousin" and that "the family was there because [his] cousin was previously deceased." Thus, as in *Gordon*, it was a fair inference from the evidence to connect the shooting with the cousin's murder. We also note that the State

only mentioned the possible motive in rebuttal after defense counsel first argued that it was "a motiveless shooting" and that "there hasn't even been any allegation of how he has any connection to any of [the victims] or why there would be a retaliatory strike three weeks after a murder." Generally, it is proper for the State to respond to arguments from defense counsel that clearly invite a response. *People v. Cosmano*, 2021 IL App (1st) 10116, ¶ 57.

¶ 86 Regardless, the evidence against defendant is even stronger than the evidence against Gordon. In addition to the evidence cited in *Gordon*, defendant personally drove the vehicle that fled from police, tested positive for GSR, and was connected via fingerprint to one of the recovered murder weapons. Finally, as in *Gordon*, the trial court instructed defendant's jury that "closing arguments are not evidence and any statement or argument made by the attorneys which is not based on the evidence is to be disregarded." We therefore find no reversible error in the State's comments.

¶ 87 In sum, defendant challenges only isolated comments on tangential trial matters. We find the challenged remarks to be generally proper, reasonably based on the evidence, and within the wide latitude afforded to the State during closing argument. Regardless, even a handful of improper remarks on minor issues would not require reversal in light of the overwhelming against defendant. Thus, defendant's arguments are meritless.

¶ 88                      D. Request for a Continuance

¶ 89 Defendant next argues that he was deprived of his right to the counsel of his choice when the trial court denied his posttrial request for a continuance to find substitute counsel. Defendant therefore asks us to remand the matter "to allow [him] to obtain new counsel and for a new sentencing hearing."

¶ 90    Both the Illinois and United States Constitutions guarantee criminal defendants the right to retain counsel of their choosing. U.S. Const. amend. VI; Ill. Const. 1970 art. I, § 8. However, that right is not absolute and cannot be used to " 'thwart the administration of justice, or to otherwise embarrass the effective prosecution of crime.' " *People v. Bingham*, 364 Ill. App. 3d 642, 645 (2006) (quoting *People v. Solomon*, 24 Ill. 2d 586, 590 (1962)). Thus, when faced with a defendant's request for a continuance to procure substitute counsel, a court must balance the defendant's right to counsel with the need for efficient administration of justice. *Id.* Whether a continuance is proper necessarily depends on the particular facts and circumstances of each case. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). Factors for the court to consider include (1) whether the defendant articulates an acceptable reason for seeking new counsel, (2) whether the defendant has been in continuous custody, (3) the defendant's efforts in obtaining new counsel, (4) the defendant's cooperation with current counsel, and (5) the length of time current counsel has represented the defendant. *People v. Adams*, 2016 IL App (1st) 141135, ¶ 13. Whether to grant or deny a continuance for the substitution of counsel is left to the discretion of the trial court, and the court's decision will not be reversed on appeal absent an abuse of that discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000).

¶ 91    Initially, we note that defendant concedes that this issue was "not fully preserved," presumably because it was not included in his posttrial motion. See *People v. Ramirez*, 2023 IL App (1st) 221227, ¶ 43 ("In order to preserve an alleged error for appellate review, a defendant must raise the alleged error both at trial and in a posttrial motion, or else the alleged error is forfeited."). He nevertheless maintains that we should review the matter under the second prong of the plain error doctrine, which allows us to review a forfeited issue where "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 92 In this case, the record shows that defendant's posttrial motion was filed by his trial counsel before defendant raised his *pro se* request for a continuance to his counsel or the trial court. Thus, it would seem unfair to penalize defendant for the failure to include the matter in an already-filed motion. Additionally, we have stated that a defendant's right to counsel of his choice is so fundamental to the judicial process that "its erroneous denial requires automatic reversal" without regard to the strength of the evidence. *Adams*, 2016 IL App (1st) 141135, ¶ 15. Thus, we will review the matter for plain error. However, before applying the plain-error doctrine, we must first determine whether the trial court committed a clear or obvious error. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010).

¶ 93 We find that the trial court did not abuse its discretion in this case. Defendant primarily contends that it would have been reasonable and minimally disruptive to the administration of justice to grant him a "short continuance" in which to obtain substitute counsel. However, that the continuance would have been a short one is speculative. The record shows that defendant had not yet hired substitute counsel and admitted that he had been having trouble doing so. "[I]t is well established that a trial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel." *Segoviano*, 189 Ill. 2d 228, 245 (2000). A continuance would have required substitute counsel to have been identified, hired, and sufficiently familiarized with the issues to argue posttrial motions and sentencing in a triple murder case. In contrast, defendant's trial counsel was uniquely familiar with the case, as he had continuously represented defendant for more than four years at the time defendant requested continuance. The record does not reveal any notable disagreement between defendant and counsel

during this time. Indeed, and perhaps more importantly, defendant never articulated any reason why he sought to change counsels or why he waited until five months after the end of trial to request a continuance.

¶ 94 Defendant counters by arguing that he never specified the length or reason for the sought continuance because the trial court's inquiry into his request was insufficient. Defendant supports this argument by citing to *Adams*, where this court reversed a conviction based on "the trial court's utter failure to make any kind of inquiry into [the defendant's] request" for a continuance to substitute counsel. *Adams*, 2016 IL App (1st) 141135, ¶ 16. However, this case is not like *Adams* because the trial court here asked defendant several direct questions and gave him multiple opportunities to explain why he sought to substitute his counsel. Although we agree with defendant that the court could have asked slightly more specific questions, we cannot say that this rose to the level of abuse of discretion. See *People v. Roberts*, 2021 IL App (3d) 190445, ¶ 36 (trial court's inquiry was sufficient where the court "provided [the] defendant with multiple open-ended opportunities to express the reasons for her dissatisfaction" with counsel). We also disagree that the court was required to ask additional questions because defendant "lacked the legal expertise" to respond to the court's inquiries. When requesting a continuance to obtain substitute counsel, it does not take a trained legal mind to explain the basic reason for the request or the approximate length of the continuance sought. We note in this regard that defendant was 26 years old at the time of his request, had attended college on an academic scholarship, and, according to the trial court, was "obviously well educated." Under these circumstances, the court did not abuse its discretion in denying defendant's posttrial request for a continuance.

¶ 95 E. Proportionate Penalties Clause

¶ 96 Finally, defendant argues that his mandatory life sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him because of his age, background, and potential for rehabilitation. Defendant also contends, in the alternative, that his trial counsel was ineffective for failing to support this claim with scientific evidence that his developing brain was comparable to that of a juvenile offender.

¶ 97 The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This clause is similar to the eighth amendment to the United States Constitution, which prohibits "cruel and unusual punishments." U.S. Const., amend. VIII; *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 42.

¶ 98 In *Miller*, the United States Supreme Court held that a sentencing scheme that requires a juvenile offender to serve life in prison without the possibility of parole violates the eighth amendment. *Miller*, 567 U.S. 460, 465 (2012). The Court reasoned in part that a sentencing court should be able to consider the role that the juvenile offender's youth and its attendant characteristics played in the offense, as well as the nature of the offense itself and the juvenile's potential for rehabilitation. *Id.* at 477. Illinois courts have since adopted the reasoning of *Miller* with respect to eighth amendment claims, but have made clear that "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *People v. Harris*, 2018 IL 121932, ¶ 61.

¶ 99 Defendant acknowledges that he was too old at the time of the offense to raise an eighth amendment *Miller* claim. However, defendant maintains that he may still raise a similar claim under the proportionate penalties clause because emerging neuroscience suggests that the development of a 21-year-old's brain is similar to that of a juvenile or young adult offender.

¶ 100   Illinois courts have held that the proportionate penalties clause provides greater protection against oppressive sentences than the eighth amendment. *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 55. Moreover, as defendant points out, our supreme court has not necessarily foreclosed the possibility that offenders over the age of 18 but under the age of 21 could raise a proportionate penalties clause claim based on *Miller* principles in a postconviction petition. *People v. Harris*, 2018 IL App (1st) 121932, ¶¶ 1, 48 (18-year-old defendant); *People v. Thompson*, 2015 IL App (1st) 118151, ¶¶ 43-44 (19-year-old defendant).

¶ 101   Critically, however, "[n]one of the defendants in those cases were over the age of 21." *People v. Clark*, 2023 IL 127273, ¶ 88. Indeed, this court has repeatedly rejected proportionate penalties clause claims for defendants age 21 and over. See, *e.g.*, *People v. Everett*, 2022 IL App (1st) 201169, ¶ 40; *People v. Green*, 2022 IL App (1st) 200749, ¶ 42; *People v. Montanez*, 2022 IL App (1st) 191930, ¶ 56; *People v. Williams*, 2021 IL App (1st) 190535, ¶ 35.

¶ 102   Moreover, this case does not present the rare sort of facts that might allow a defendant over the age of 18 to raise a successful proportionate penalties clause claim based on *Miller* principles. Not only was defendant 21 years old at the time of the offense, the record does not suggest that he was particularly immature or impetuous for his age. At the time of the shooting, defendant was a high school graduate who was attending college on an academic scholarship while also playing on the football team and working as a resident assistant in the dormitories. Additionally, this is not a case where defendant played only a minor role in the offense. *Cf. People v. Leon Miller*, 2002 Ill. 2d 328, 341-343 (15-year-old defendant convicted under a theory of accountability for serving as a "lookout" during a shooting). Instead, the evidence showed that defendant personally drove the gunmen to the shooting, fired at the victims more than a dozen times, and lead the police on a high-speed chase while attempting to escape. Thus, defendant's life sentence is not disproportionate as

applied to him. Furthermore, trial counsel was not ineffective by failing to present additional evidence to support this argument.

¶ 103                                    III. CONCLUSION

¶ 104   For the reasons stated, we affirm the judgment of the circuit court.

¶ 105   Affirmed.